NEIBARGER v UNIVERSAL COOPERATIVES, INC

HOUGHTON v ALFA-LAVAL, INC

Docket Nos. 88206, 89140. Argued October 8, 1991 (Calendar Nos. 5-6). Decided May 20, 1992.

Darwin E. Neibarger and Patricia L. Neibarger, owners and operators of a dairy farm, brought an action in the Mecosta Circuit Court against Universal Cooperatives, Inc., and others, alleging that the entire vacuum system of their milking equipment had been improperly designed and installed, and claiming breach of express warranty, breach of implied warranty, and negligence. The court, Lawrence C. Root, J., granted summary disposition for the defendants, finding that the Uniform Commercial Code controlled and that its four-year period of limitation had expired before the complaint was filed. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and SAWYER and NEFF, JJ., affirmed in an opinion per curiam (Docket No. 111029). The plaintiffs appeal.

Charles F. Houghton and Jeanette Houghton, owners and operators of a dairy farm, brought an action in the Mecosta Circuit Court against Alfa-Laval, Inc., and others, alleging negligence in design, installation, and maintenance of a milking machine system and breach of express and implied warranties. The court, Lawrence C. Root, J., granted summary disposition for the defendants. The Court of Appeals, MACKENZIE, P.J., and D. E. HOLBROOK, JR., and WEAVER, JJ., affirmed in an opinion per curiam, holding that the remedies lay exclusively within the UCC and were subject to the four-year period of limitation which began to run upon the delivery of the milking system (Docket No. 112417). The plaintiffs appeal.

In an opinion by Justice GRIFFIN, joined by Justices BRICKLEY, RILEY, and MALLETT, the Supreme Court *held:*

Where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the

REFERENCES

Am Jur 2d, Limitations on Actions §§ 89-99, 107-117, 138 *et seq.*; Sales §§ 928-953.

See the Index to Annotations under Defects and Irregularities; Sales; Uniform Commercial Code.

exclusive remedy is provided by the Uniform Commercial Code, including the four-year statute of limitations.

1. Article 2 of the Uniform Commercial Code governs relationships between parties involved in transactions in goods. Such transactions are accompanied by implied warranties of merchantability and fitness; express warranties may be created by negotiation or by the conduct of the seller. Thus, under the UCC, the purchaser of defective goods may recover the benefit of the bargain as well as incidental and consequential damages. An action for breach of warranty under the UCC must be commenced within four years of tender of delivery of the goods, regardless of the time of the discovery of the breach. Where a claim arises from a commercial transaction in goods and the purchaser suffered an economic loss, the UCC's period of limitation may not be avoided by pleading in tort. The economic loss doctrine, which provides that the remedy for a purchaser's frustrated expectations of a product is in contract alone, bars such claims.

2. The economic loss doctrine distinguishes between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner traditionally remedied by the law of torts. The individual consumer's tort remedy for products liability is not premised upon an agreement between the parties, but derives either from a duty imposed by law or from policy considerations which allocate the risk of dangerous and unsafe products to the manufacturers and sellers in order to encourage the design and production of safe products. However, in a commercial transaction, the parties to a sale of goods have the opportunity to negotiate the terms and specifications, including warranties, disclaimers, and limitation of remedies. Where a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort fail to serve the purpose of encouraging the design and production of safer products.

3. The UCC represents a carefully considered approach to governing the economic relations between suppliers and consumers of goods. Rejection of the doctrine in effect would create a remedy not contemplated by the Legislature in adopting the UCC by permitting a potentially large recovery for a minor defect in quality. Adoption of the doctrine will allow sellers to predict with greater certainty their potential liability for product failure and to incorporate those predictions into the price

or terms of the sale. The doctrine also is consistent with the stated purposes of the UCC to simplify, clarify, modernize, and unify commercial law.

4. In these cases, because the damages sought are economic losses resulting from the commercial sale of goods, the plaintiffs' exclusive remedies are provided by the UCC. Because proceedings in each case were not commenced within the four-year period of limitation, the actions are barred.

Affirmed.

Justice LEVIN, joined by Chief Justice CAVANAGH and Justice BOYLE, dissenting, stated that the plaintiffs should be permitted to maintain an action in tort, and should not be limited to the remedy for breach of implied warranty provided in the sale of goods article of the UCC.

Courts in other jurisdictions that have considered whether the remedy for breach of implied warranty provided in the UCC is the exclusive remedy have universally agreed that a tort action may be maintained to recover for personal injuries or death resulting from product defect.

Where personal injury or death is not involved, and the loss is essentially economic, one line of authority, adopted by most courts that have considered the matter, precludes maintenance of a tort action, and confines the purchaser to an action for breach of warranty under the UCC, where the damage is essentially to the defective product sold by the seller *and no other property is damaged.* A second line of authority permits a purchaser of a defective product to maintain a tort action for loss of the defective product without regard to whether property other than the defective product is also damaged by reason of the defect.

Under either of the established lines of authority, the purchaser may maintain an action in tort where the product defect causes damage to other property. Accordingly, under either established line of authority, this action may be maintained because plaintiffs claim injury to their dairy herds, property other than the purchased automated milking system.

While a tort action must be commenced within three years of the accrual of a claim, the action does not accrue before the plaintiff should have discovered the claim.

181 Mich App 794; 450 NW2d 88 (1989) affirmed.

184 Mich App 731; 459 NW2d 42 (1990) affirmed.

*Southgate Community School Dist v West Side Construction Co,* 399 Mich 72; 247 NW2d 884 (1976) modified.

SALES — UNIFORM COMMERCIAL CODE — ECONOMIC LOSS — PERIOD OF
LIMITATION.

> Where a plaintiff seeks to recover for economic loss caused by a
> defective product purchased for commercial purposes, the ex-
> clusive remedy is provided by the Uniform Commercial Code,
> including the four-year statute of limitations (MCL 440.2101 *et
> seq.*, 440.2725[2]; MSA 19.2101 *et seq.*, 19.2725[2]).

*Reber, Greer, Schuiteman, Stariha & Greer, P.C.*
(by *Paul L. Greer*), for the plaintiffs.

*Foster, Swift, Collins & Smith, P.C.* (by *David H.
Aldrich* and *Michael S. Wellman*), for defendant
Universal Cooperatives, Inc.

*Mika, Meyers, Beckett & Jones* (by *Douglas A.
Donnell*) for defendant Brinker.

*Cholette, Perkins & Buchanan* (by *Robert J.
Riley*) for defendant Alfa-Laval, Inc.

*Petersmarck, Callahan, Bauer & Maxwell, P.C.*
(by *Richard W. West*) for defendant Howard's
Dairy System, Inc.

Amicus Curiae:

*Simpson Moran* (by *Philip J. Goodman* and
*Steven G. Silverman*) for Wayne County.

GRIFFIN, J. We granted leave to consider the
applicability in these consolidated cases of the
"economic loss doctrine," which bars tort recovery
and limits remedies to those available under the
Uniform Commercial Code[1] where a claim for
damages arises out of the commercial sale of goods
and losses incurred are purely economic. If plain-
tiffs in these cases are limited by the doctrine to a
warranty action governed by the UCC and its four-

[1] MCL 440.1101 *et seq.*; MSA 19.1101 *et seq.*

year statute of limitations, which recognizes no discovery rule, their claims are time-barred.

The courts below so held. Upon review we agree and affirm the decisions of the Court of Appeals.

I

The facts and procedural background of these cases are very similar. Indeed, both were brought in the Mecosta Circuit Court[2] and were considered by the same circuit judge.[3] With supplementation to be provided in the course of our analysis, we borrow from the concise statement of facts set forth in each case by the Court of Appeals.

*NEIBARGER v UNIVERSAL COOPERATIVES, INC*

Plaintiffs, owners and operators of a dairy farm, contracted with defendant Charles Brinker to install a milking system. According to plaintiffs, the milking system was designed by defendants Universal Cooperatives, Inc., and Brinker, and was installed by Brinker to begin milking operations on September 1, 1979.

Plaintiffs allege that, after the milking system had been in operation for a period of time, their cattle became ill and died or had to be sold for beef because of their nonproductivity and unsuitability as milking animals, suffered a loss of milk production, had severe instances of mastitis, and experienced a loss of a portion of their udders. Consequently, plaintiffs claim, they were prevented from reaching their herd potential.

Plaintiffs alleged that it was not until fall of 1986 that they discovered that the entire vacuum system on the milking equipment had been improperly designed and installed. Plaintiffs brought

[2] Although the Neibarger case was originally filed in Montcalm County, the parties agreed to and requested a change of venue, which was ordered.

[3] Honorable Lawrence C. Root.

suit against defendants on April 13, 1987, and proceeded against them on three theories: breach of express warranty, breach of implied warranty, and negligence. [181 Mich App 794, 796; 450 NW2d 88 (1989).]

After some discovery, defendants filed motions for summary disposition, arguing that because plaintiffs' claim arose from the commercial sale of goods and they sought only economic damages, their exclusive remedy was a breach of warranty action under Article 2 of the UCC.[4] Further, defendants contended that such an action was barred in this case by the code's four-year limitation period, which begins running "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." MCL 440.2725(2); MSA 19.2725(2).

Plaintiffs, on the other hand, preferred the three-year statute of limitations for product liability actions set forth in the Revised Judicature Act, MCL 600.5805(9); MSA 27A.5805(9), arguing that it would not begin to run until the cause of the action was discovered, or reasonably should have been discovered.[5] Concluding that the UCC controlled and that its limitation period had expired before the complaint was filed, the trial court granted summary disposition for defendants. Plaintiffs appealed, and the Court of Appeals affirmed. After finding that the transaction involved was "a sale of goods with services incidentally involved," and the damages sought "consisted solely of economic loss," the Court concluded that "plaintiffs' remedies fall within the UCC, with its

[4] MCL 440.2101 et seq.; MSA 19.2101 et seq.

[5] Plaintiffs also pointed to MCL 600.5833; MSA 27A.5833, which provides that "[i]n actions for damages based on breach of a warranty of quality or fitness the claim accrues at the time the breach of the warranty is discovered or reasonably should be discovered."

attendant four-year period of limitation, which began to run at the time of delivery." *Id.* at 802.

### HOUGHTON v ALFA-LAVAL, INC

Plaintiffs, owners and operators of a dairy farm, purchased a milking machine system in July, 1976, from defendant Alfa-Laval, Inc. It was installed according to Alfa-Laval's design and instructions by its agent, defendant Howard's Dairy System, Inc.

Plaintiffs represent that they purchased the system in the hopes of increasing milk production. Milk production, however, did not increase despite numerous service calls from Howard's and advice and inspections from several milk production agencies and nutritionists. The cattle in plaintiffs' herd began to experience severe instances of mastitis, losses of a quarter of their udders and decreased milk production. Some of the herd became so sick that they died or were sold off for beef due to nonproductivity. Another problem plaintiffs discovered following the installation of the new system was an unacceptably high cell and bacteria count in the milk. Plaintiffs also claim that, due to faulty wiring, stray voltage would enter the system and injure the cattle and that there were problems with the system's cooling and vacuum systems.

Plaintiffs allege that it was not until some time in 1984 that they were able to pinpoint their problems as stemming from the improper installation of the machine's washing system. Plaintiffs thereupon filed suit against defendants alleging negligence in design, installation and maintenance of the system and breach of express and implied warranties. [184 Mich App 731, 732-733; 459 NW2d 42 (1990).]

As in *Neibarger,* and for similar reasons, the trial court granted defendants' motion for sum-

mary disposition. The Court of Appeals affirmed, concluding that plaintiffs' remedies "laid exclusively within the UCC and were subject to the four-year limitation period which began running upon delivery of the milking system in 1976." *Id.* at 734.

We granted leave to appeal in both cases to consider the applicability of the economic loss doctrine as well as the proper limitation period. 437 Mich 928 (1991).

II

Michigan adopted the Uniform Commercial Code with the passage of 1962 PA 174, effective January 1, 1964.[6] The stated purposes of the code are "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; [and] (c) to make uniform the law among the various jurisdictions."[7]

To achieve these goals, Article 2 of the code governs the relationship between the parties involved in "transactions in goods."[8] Under Article 2, a sale of goods is accompanied by the implied warranties of merchantability[9] and fitness[10] and an express warranty may be created by negotiation or by the conduct of the seller.[11] Thus, under the code, the purchaser of defective goods may recover the benefit of the bargain (the difference between the value of the goods as delivered and the value the goods would have had they complied with the

---

[6] 1962 PA 174, § 9991.

[7] MCL 440.1102(2); MSA 19.1102(2).

[8] MCL 440.2102; MSA 19.2102.

[9] MCL 440.2314; MSA 19.2314.

[10] MCL 440.2315; MSA 19.2315.

[11] MCL 440.2313; MSA 19.2313.

warranty)[12] as well as incidental and consequential damages in a proper case.[13] An action to recover for breach of warranty under the UCC must be commenced within four years of tender of delivery of the goods, regardless of the time of discovery of the breach.[14]

Since the plaintiffs' claims in each of these cases arose out of a sale of goods governed by the UCC, we must determine whether the consequences of its strict limitation period may be avoided by pleading claims sounding in tort. Where, as here, the claims arise from a commercial transaction in goods and the plaintiff suffers only economic loss, our answer is "no"—such claims are barred by the economic loss doctrine. This position is consistent with a considerable body of law that has developed in this state as well as a majority of other jurisdictions.[15]

The economic loss doctrine, simply stated, provides that " '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.' "[16] This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commer-

[12] MCL 440.2725; MSA 19.2725.

[13] MCL 440.2715; MSA 19.2715.

[14] MCL 440.2725; MSA 19.2725.

[15] Wade, *Tort liability for products causing physical injury and Article 2 of the UCC*, 48 Mo L R 1, 26, n 87 (1983): "Although there is some disagreement on the matter, the substantial majority rule has come to be . . . that economic loss deriving from a failure of the product to perform in accordance with the implied warranties is not actionable in tort, whether negligence or strict liability." See also 63A Am Jur 2d, Products Liability, § 970, p 118.

[16] *Kershaw Co Bd of Ed v United States Gypsum Co,* 302 SC 390, 393; 396 SE2d 369 (1990), quoting *Kennedy v Columbia Lumber & Mfg Co,* 299 SC 335, 345; 384 SE2d 730 (1989).

cial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.[17]

This distinction stems from the separate and sometimes conflicting purposes of tort and contract law, as explained by the Supreme Court of New Jersey in *Spring Motors Distributors, Inc v Ford Motor Co,* 98 NJ 555, 579-580; 489 A2d 660 (1985):

> The purpose of a tort duty of care is to protect society's interest in freedom from harm, *i.e.,* the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.[18]

This distinction was also recognized by the court in *Miller v United States Steel Corp,* 902 F2d 573, 574 (CA 7, 1990), where Judge Posner explained that the term "economic loss" may be a misnomer:

---

[17] See *Clark v Int'l Harvester Co,* 99 Idaho 326, 335; 581 P2d 784 (1978), *Waggoner v Town & Country Mobile Homes, Inc,* 808 P2d 649, 653 (Okla, 1990).

[18] See also Wade, n 15 *supra,* p 24:

> Contract law protects the expectation interest. It seeks to place the plaintiff in the position he would have been in if the defendant had not broken the contract. Tort law has as its gravamen the restoring of the plaintiff to the position he had been in before the defendant's wrongful conduct injured him. The details and ramifications of the two sets of laws were developed in the light of the primary purpose of each.

It would be better to call it a "commercial loss," not only because personal injuries and especially property losses are economic losses, too—they destroy values which can be and are monetized—but also, and more important, because tort law is a superfluous and inapt tool for resolving purely commercial disputes. We have a body of law designed for such disputes. It is called contract law. Products liability law has evolved into a specialized branch of tort law for use in cases in which a defective product caused, not the usual commercial loss, but a personal injury to a consumer or bystander.

In *Parish v B F Goodrich Co,* 395 Mich 271, 278; 235 NW2d 570 (1975), Justice LEVIN alluded to this distinction in explaining the reasons for not applying the UCC (and its statute of limitations) in personal injury cases:

The provisions of UCC § 2-725 (a warranty is breached upon tender of delivery), while entirely satisfactory in a commercial setting, are inconsistent with principles developed by the courts in consumer actions against manufacturers for personal injury. While most business losses attributable to a defective product will surface during the four-year period prescribed by § 2-725, consumers often suffer personal injury after a longer period of time has elapsed.

According to Justice LEVIN, the distinction stems from the bases of tort and contract liability:

Section 2-725 concerns, if not only, primarily claims based on an *agreement* of the parties to the litigation—including actions based on warranties implied from or in respect of their agreement.

The product liability of a manufacturer, not in direct dealing with the consumer, has, in contrast, been imposed by the courts with little or no regard·

to whether there is an agreement between the parties and in the face of attempts by some manufacturers to disclaim liability in recitals accompanying the product into the market place. [*Id.* at 279-280.]

As developed by the courts, then, the individual consumer's tort remedy for products liability is not premised upon an agreement between the parties, but derives either from a duty imposed by law or from policy considerations which allocate the risk of dangerous and unsafe products to the manufacturer and seller rather than the consumer. Such a policy serves to encourage the design and production of safe products.

On the other hand, in a commercial transaction, the parties to a sale of goods have the opportunity to negotiate the terms and specifications, including warranties, disclaimers, and limitation of remedies. Where a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort fail to serve the purpose of encouraging the design and production of safer products.

III

Heretofore, this Court has not explicitly addressed the economic loss doctrine.[19] However, dur-

[19] See however, *Ebers v General Chemical Co,* 310 Mich 261, 275; 17 NW2d 176 (1945), where this Court allowed tort recovery to a plaintiff who pled breach of warranty. We said the real issue was "whether or not [the manufacturer] was negligent" in selling an inadequately tested insecticide which damaged the plaintiff's fruit trees. In *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), the plaintiff was awarded damages from the manufacturer of defective cinder blocks used in the construction of the plaintiff's resort cottages. Both cases were decided before adoption by this state of the UCC.

More recently, in *Southgate Community School Dist v West Side*

ing the past dozen years our Court of Appeals and the federal courts applying Michigan law have regularly invoked the economic loss doctrine in appropriate cases where conflict arises from the disparate goals of tort and contract law. In *McGhee v General Motors Corp,* 98 Mich App 495, 505; 296 NW2d 286 (1980), the first such decision, the Court adopted the rationale expressed in *S M Wilson & Co v Smith Int'l, Inc,* 587 F2d 1363, 1376 (CA 9, 1978):

> Where the suit is between a nonperforming seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code. To treat such a breach as an accident is to confuse disappointment with disaster. Whether the complaint is cast in terms of strict liability in tort or negligence should make no difference. [Citations omitted.]

Since *McGhee,* the validity of this approach has been recognized in virtually every published opinion applying Michigan law to the issue of economic loss stemming from a commercial sale of goods. In *A C Hoyle Co v Sperry Rand Corp,* 128 Mich App 557, 561-562; 304 NW2d 326 (1983), the Court affirmed the dismissal of the plaintiff's claim of negligence in the design, manufacture, and delivery of hydraulic motors to be installed on oil tankers, holding that none of the policies supporting products liability law "would be served in the

---

*Construction Co,* 399 Mich 72; 247 NW2d 884 (1976), a decision that focused on privity, the plaintiff recovered in tort from a remote manufacturer for what appeared to be economic loss. To the extent that *Southgate* may read as rejecting the economic loss doctrine, it is today modified.

instant case, which involves contracting parties of relatively equal economic strength who, in a commercial setting, bargain for the specifications of the product." The doctrine was also applied in *Great American Ins Co v Paty's, Inc,* 154 Mich App 634; 397 NW2d 853 (1986), where a farmer sought to recover for damage to a combine which was destroyed by fire, and in *Rust-Pruf Corp v Ford Motor Co,* 172 Mich App 58, 62; 431 NW2d 245 (1988), where the plaintiff's tort claim was barred because of an express warranty and lack of any injury other than economic loss. Most recently, in *Sullivan Industries, Inc v Double Seal Glass Co, Inc,* 192 Mich App 333, 344; 480 NW2d 623 (1991), the Court held that "[a]llegations of only economic loss do not implicate tort law concerns with product safety, but do implicate commercial law concerns with economic expectations."

Even where the Court of Appeals refused to apply the economic loss doctrine to bar a plaintiff's claim, in *Auto-Owners Ins Co v Chrysler Corp,* 129 Mich App 38, 42; 341 NW2d 223 (1983), the Court implicitly recognized the rationale supporting the doctrine, holding only that it "fails when there is no contractual relationship between the parties." In a strong dissent, Chief Judge Danhof stated his belief that "plaintiff's negligence claim should be barred for the reasons stated in *McGhee, supra.*" 129 Mich App 44. His dissent was later adopted by the Court in *Sullivan, supra* at 339.

This development in the jurisprudence of our state has been recognized by federal courts applying Michigan law. In *Sylla v Massey-Ferguson, Inc,* 660 F Supp 1044, 1046 (ED Mich, 1984), Judge Harvey explained that "when a plaintiff seeks to impose liability for economic losses only, tort law concerns with product safety no longer apply, and

commercial law concerns with economic expectations must govern." A similar result was achieved in *Consumers Power Co v Mississippi Valley Structural Steel Co,* 636 F Supp 1100, 1105 (ED Mich, 1986), where Judge Joiner noted:

> [T]he tort doctrine of products liability is based on the policy of allocating the risk of dangerous or unsafe products to the manufacturer rather than the consumer. Where *all* parties involved . . . are commercial businesses, this rationale disappears. Placing the burden of the loss on any particular business will only result in that business raising its prices to pass these costs along to consumers. The courts should have no role in deciding which business should raise its prices, especially in light of the parties' ability to allocate those risks among themselves.

The economic loss doctrine was also applied in *Frey Dairy v A O Smith Harvestore Products, Inc,* 680 F Supp 253 (ED Mich, 1988), aff 'd 886 F2d 128 (CA 6, 1989), where Judge Cohn applied the reasoning of the *McGhee* panel in a case in which the plaintiffs sought recovery for reduced milk production and lost profits allegedly caused by defective silos. Noting that the plaintiffs waited almost six years before filing suit, he held that "summary judgment must be granted to both defendants on the grounds that the expiration of the statute of limitations bars the warranty claims and the economic loss doctrine bars the tort claims . . . ." 680 F Supp 256.[20]

[20] On appeal of *Frey Dairy,* the United States Court of Appeals for the Sixth Circuit certified the following question to this Court: "Under Michigan law, does the economic loss doctrine operate to bar tort claims sounding in negligence and gross negligence where the foundation of the parties' relationship is contractual and the only losses alleged are economic losses?" After we declined to address the question, 432 Mich 1240 (1989), the court decided the case on different grounds. 886 F2d 131.

The reasoning of these courts comports with the reasoning of courts in the majority of jurisdictions which have adopted the economic loss doctrine.[21] In the decision generally regarded as the genesis of the doctrine, *Seely v White Motor Co,* 63 Cal 2d 9, 18; 45 Cal Rptr 17; 403 P2d 145 (1965), the California Supreme Court stated its rationale for barring a tort recovery for economic loss:

> A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.

More recently, in *East River Steamship Corp v Transamerica Delaval Inc,* 476 US 858, 868; 106 S Ct 2295; 90 L Ed 2d 865 (1986), the Supreme Court explained that in cases such as those before us, "the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain."

IV

We are convinced that the reasoning of those courts which have adopted the economic loss doctrine compels a similar conclusion on our part. In the absence of legislative direction, we believe such a rule is required to guide trial courts facing cases such as those before us which lie at the intersection of tort and contract. Accordingly, we hold that where a plaintiff seeks to recover for

[21] See *Spring Motors Distributors, Inc v Ford Motor Co, supra.*

economic loss caused by a defective product pur-
chased for commercial purposes, the exclusive
remedy is provided by the UCC, including its stat-
ute of limitations.

A contrary holding would not only serve to blur
the distinction between tort and contract, but
would undermine the purpose of the Legislature in
adopting the UCC. The code represents a carefully
considered approach to governing "the economic
relations between suppliers and consumers of
goods."[22] If a commercial purchaser were allowed
to sue in tort to recover economic loss, the UCC
provisions designed to govern such disputes, which
allow limitation or elimination of warranties and
consequential damages, require notice to the
seller, and limit the time in which such a suit
must be filed, could be entirely avoided. In that
event, Article 2 would be rendered meaningless
and, as stated by the Supreme Court in *East River,*
*supra* at 866, "contract law would drown in a sea
of tort."

Rejection of the economic loss doctrine would, in
effect, create a remedy not contemplated by the
Legislature when it adopted the UCC by permitting
a potentially large recovery in tort for what may
be a minor defect in quality.[23] On the other hand,
adoption of the economic loss doctrine will allow
sellers to predict with greater certainty their po-
tential liability for product failure and to incorpo-
rate those predictions into the price or terms of
the sale.

Adoption of the economic loss doctrine is consis-
tent with the stated purposes of the UCC. The

[22] *Moorman Mfg Co v Nat'l Tank Co,* 91 Ill 2d 69, 78; 61 Ill Dec 746;
435 NE2d 443 (1982).

[23] See *Superwood Corp v Siempelkamp Corp,* 311 NW2d 159, 162
(Minn, 1981), overruled on other grounds *Hapka v Paquin Farms,* 458
NW2d 683 (Minn, 1990).

availability of a tort action for economic loss would "only add more confusion in an area already plagued with overlapping and conflicting theories of recovery,"[24] while preclusion of such actions will lead to the simplification, clarification, and modernization of commercial law called for by § 1-102(2)(a). Moreover, because a majority of other jurisdictions have adopted the economic loss doctrine, our decision here will promote the uniformity called for in § 1-102(2)(c).

In the cases before us, plaintiffs argue that their claims fall within the class of products liability actions defined in MCL 600.2945; MSA 27A.2945,[25] and that the proper statutes of limitation and accrual are those provided by the Revised Judicature Act, MCL 600.5805(9); MSA 27A.5805(9) and MCL 600.5833; MSA 27A.5833. We disagree for the reasons stated above. Application of the RJA to the cases before us would effectively negate Article 2 of the UCC; application of the economic loss doctrine ensures that the UCC will remain effective in governing commercial disputes, while the RJA serves to govern noncommercial products liability actions.

V

Having decided that the UCC and the economic loss doctrine reflect the proper approach for reso-

---

[24] *Clark v Int'l Harvester Co*, n 17 *supra*.
[25] MCL 600.2945; MSA 27A.2945:

> "[P]roducts liability action" means an action based on any legal or equitable theory of liability brought for or on account of death or injury to person or property caused by or resulting from the manufacture, construction, design, formula, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, advertising, packaging, or labeling of a product or a component of a product.

lution of defective product claims in the commercial arena, we now turn to application of that doctrine to the cases before us. In the Court of Appeals, the plaintiffs argued that the economic loss doctrine does not bar their claims because they are asserting damage to property other than the goods themselves. Although there is support for the view that the UCC does not bar a tort claim where the plaintiffs are seeking to recover for property other than the product itself, we find in these cases that, notwithstanding injury to the plaintiffs' dairy herds, the damages claimed are economic losses.

At one end of the spectrum, the economic loss doctrine has been interpreted as permitting recovery in tort for injury to property other than the defective product itself. *Nat'l Union Fire Ins Co of Pittsburgh v Pratt & Whitney Canada, Inc,* 107 Nev 535; 815 P2d 601 (1991); *Kershaw Co Bd of Ed v United States Gypsum Co,* 302 SC 390; 396 SE2d 369 (1990). Other courts have allowed tort recovery for physical damage to the product itself caused by a defect which is not merely a "disappointment," but also a safety hazard, *Russell v Ford Motor Co,* 281 Or 587; 575 P2d 1383 (1978), or which results from a "calamitous" event. *Star Furniture Co v Pulaski Furniture Co,* 171 W Va 79; 297 SE2d 854 (1982).

In a case factually similar to those before us, *Agristor Leasing v Spindler,* 656 F Supp 653, 654 (D SD, 1987), the court found that damage to a dairy herd constituted economic loss rather than property damage where the purchasers of a feed storage system alleged that it was negligently designed and manufactured. The plaintiffs claimed that the defective product spoiled the feed it contained and resulted in "their dairy herd suffering medically and reproductively, milk production

dropping and, ultimately, lost income." Finding that the plaintiffs were merely seeking "to recover the resulting losses to their dairy farm due to the Harvestore silo failing to perform as expected," *id.* at 658, the court characterized the injuries as economic loss and denied recovery in tort.

We agree. The proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages.[26] The essence of a warranty action under the UCC is that the product was not of the quality expected by the buyer or promised by the seller. The standard of quality must be defined by the purpose of the product, the uses for which it was intended, and the agreement of the parties. In many cases, failure of the product to perform as expected will necessarily cause damage to other property;[27] such damage is often not beyond the contemplation of the parties to the agreement. Damage to property, where it is the result of a commercial transaction otherwise within the ambit of the UCC, should not preclude application of the economic loss doctrine where such property damage necessarily results from the delivery of a product of poor quality.

In *Hapka v Paquin Farms,* 458 NW2d 683, 688 (Minn, 1990), the Supreme Court of Minnesota opined that "[t]he steady stream of litigation attempting to qualify for the exceptional treatment of damage to other property has convinced us that the exception represents a retreat to the common law in derogation of the essence of the Uniform Commercial Code: a complete and independent statutory scheme enacted for the governance of all

[26] See *Kershaw Co Bd of Ed v United States Gypsum Co,* n 16 *supra; Pisano v American Leasing,* 146 Cal App 3d 194; 194 Cal Rptr 77 (1983).

[27] See, e.g., *Chicago Heights Venture v Dynamit Nobel of America, Inc,* 782 F2d 723 (CA 7, 1986) (a leaking roof caused water damage to other parts of an apartment building).

commercial transactions."[28] We agree with this
analysis, noting, as did the *Hapka* court, that the
UCC provides remedies sufficient to compensate the
buyer of a defective product for direct, incidental,
and consequential losses, including property dam-
age. MCL 440.2714; MSA 19.2714, MCL 440.2715;
MSA 19.2715. Where damage to other property
was caused by the failure of a product purchased
for commercial purposes to perform as expected,
and this damage was within the contemplation of
the parties to the agreement, the occurrence of
such damage could have been the subject of negoti-
ations between the parties.

In the two cases before us, a review of the
pleadings and depositions reveals that the dam-
ages sought by the plaintiffs are commercial losses
which can be remedied only under the provisions
of the UCC.[29]

The physical damage to property alleged by the
plaintiffs includes instances of mastitis and other
illnesses that allegedly caused the death of some
cattle or necessitated culling them from the herd
and selling them for beef. However, in his deposi-
tion, plaintiff Darwin Neibarger testified that mas-
titis is a common problem for dairy farmers. Plain-
tiff Charles Houghton testified that mastitis could
occur even where the cows were milked by hand,
and his testimony reveals that he was aware that

[28] The Minnesota Legislature has since modified the rule stated in
*Hapka,* with passage of Minn Stat, § 604.10, which allows tort recov-
ery for economic loss arising "from a sale of goods that is due to
damage to tangible property other than the goods sold . . . but
economic loss that arises from a sale of goods between parties who are
each merchants in goods of the kind is not recoverable in tort."
*ZumBerge v Northern States Power Co,* 481 NW2d 103, 107, n 2
(Minn App, 1992).

[29] A motion for summary disposition premised upon the statute of
limitations is governed by MCR 2.116(C)(7); in deciding such a motion,
a court must consider the pleadings, affidavits, depositions, admis-
sions, and other documentary evidence filed by the parties. MCR
2.116(G)(5).

mastitis could be caused by the milking system. Deposition testimony also reveals that culling the cows was a normal part of the dairy business, and that the Houghtons would replace as many as twenty-five percent of their cows every year. Houghton, in fact, testified that he anticipated problems with the new system because some cows would not adapt to the new system and would have to be replaced.

Viewing the complaints in light of this testimony, it is apparent that the damages suffered by the plaintiffs are properly considered to be economic loss, the result of a defect in the quality of the milking systems they purchased. The plaintiffs made business decisions to purchase new milking systems, hoping, as Charles Houghton and Darwin Neibarger testified, to expand the size of their herds and, we presume, thereby increase their incomes. Their commercial expectations were not met, however, and they experienced decreases in milk production and medical problems. Their complaints were properly viewed by the courts below as attempts to recover for lost profits and consequential damages, losses which are compensable under the UCC. Thus, these actions fall squarely within the economic loss doctrine and are governed by the provisions of the UCC, including its four-year statute of limitations.

VI

Plaintiffs also argue that the UCC does not apply to these cases because they are seeking to recover for injuries caused by the services provided by the defendants, rather than for any defect in the products provided by the defendants. If such is the case, their injuries did not arise out of a "transaction in goods" and thus are not governed by the UCC. MCL 440.2102; MSA 19.2102.

In both cases, the Court of Appeals applied the test expressed in *Bonebrake v Cox,* 499 F2d 951, 960 (CA 8, 1974), to determine whether contracts for mixed goods and services are governed by the code:

> The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved . . . .

Applying this test, the Court of Appeals found that the transactions in question were sales of goods, governed by the UCC.

We agree. The *Bonebrake* test represents the view of the majority of jurisdictions which have considered the issue.[30] It is also the most logical approach, one which allows Article 2 to fulfill its purpose of governing the relationships between buyers and sellers of goods in the commercial arena.

As the Court of Appeals noted, some courts have divided a transaction between the parties into its components of goods and services and allowed a claim outside the UCC where the complaint sought recovery for injuries caused by the services provided by the defendant. For example, in *H Hirschfield Sons Co v Colt Industries Operating Corp,* 107 Mich App 720; 309 NW2d 714 (1981), the plaintiffs sought to recover for injuries caused by the manner in which an in-ground railroad and truck scale was installed. The Court of Appeals, in a decision which it limited to the narrow set of facts before it, found that the action was not governed by the

---

[30] See anno: *Applicability of UCC Article 2 to mixed contracts for sale of goods and services,* 5 ALR4th 501, 505.

UCC "because plaintiff's claim is based entirely on deficiencies in the rendition of services for which the contract contained a separate price rather than on any defect in the goods themselves." *Id.* at 727. In reaching this decision, the *Hirschfield* Court relied on the opinion in *Dixie Lime & Stone Co v Wiggins Scale Co,* 144 Ga App 145; 240 SE2d 323 (1977), a factually similar case in which the court explained that "[t]here is no claim that the scale itself is defective. The agreement underlying this suit was one for the furnishing of services and labor, and the UCC is clearly inapplicable." *Id.*

The two decisions referred to do not persuade us that the transactions at issue here were primarily for services rather than goods. In both cases, the contracts included separate prices for products and installation. In the cases now before us, however, the purchase agreements included no mention of installation or service, nor was any separate price stated for installation or service. The services that were provided, then, must be viewed as "incidental" to the contract for the purchase of a milking system.

We prefer the approach that is illustrated by those cases in which courts have examined the overall thrust of the dealings between the parties to determine the character of the transaction. In one such case, *Care Display, Inc v Didde-Glaser, Inc,* 225 Kan 232; 589 P2d 599 (1979), the Supreme Court of Kansas considered an oral contract for the design and construction of a display booth to be used in a trade show. The court, examining the overall purpose of the dealings between the parties, found that "the construction, transportation and installation of the display booth was a part of the contract between the parties but the major objective contemplated utilizing the knowledge and expertise of Care Display to create a unique

setting in which to exhibit and promote to best advantage the products of Didde-Glaser." *Id.* at 239.

In *Republic Steel Corp v Pennsylvania Engineering Corp,* 785 F2d 174 (CA 7, 1986), the court employed a similar approach in examining the character of an agreement for the design, sale, and installation of two steel furnaces. In that case, the court, noting "Illinois law underscoring the broad coverage of the UCC and emphasizing the need for uniformity in commercial transactions," *id.* at 181, held that the fact that design, engineering and purchase agency services were a substantial part of the contract was not sufficient to preclude application of the UCC and its statute of limitations. Applying the *Bonebrake* test, the court held that "the predominant character of the Agreement . . . was that of a contract for the sale of goods, not for the rendition of services." *Id.* at 184.

The same approach is proper in these cases. It is difficult to imagine a commercial product which does not require some type of service prior to its purchase, whether design, assembly, installation, or manufacture. If a purchaser were able to avoid the UCC by pleading negligent execution of one of the services required to produce the product, Article 2 could be easily and effectively negated. A court faced with this issue should examine the purpose of the dealings between the parties. If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though goods are incidentally required in the provision of this service.

In these cases, the thrust or purpose of the plaintiffs' contracts with the defendants was not

the provision of defendants' design or installation services; rather, the plaintiffs intended to acquire goods, i.e., milking systems that incidentally required design and installation services. This conclusion is supported by the deposition testimony of plaintiffs Darwin Neibarger and Charles Houghton. Neibarger testified that he "bought the system complete" and hoped "just to go to the barn and turn it on and everything worked." Houghton viewed the transaction as a purchase of a product as well, testifying that defendant Howard was to install a milking system which he purchased, at least in part, because "it looked like a good machine." It thus appears from the testimony of the plaintiffs that their goals were to purchase milking systems; whatever design or installation services the systems required were incidental to those goals.

Plaintiffs' attempts to avoid application of the UCC by arguing that there was no defect in the product, but that it was poorly designed or installed, are to no avail.[31] At the heart of the complaints in these cases is the fact that the plaintiffs purchased products which proved inadequate for their purposes, causing them lost profits and, perhaps, consequential losses or property damage compensable in a timely suit under the provisions of the UCC.

### VII

Since the damages sought in these cases are

[31] On appeal in this Court, plaintiffs also attempt to avoid application of the UCC by arguing that there is no privity of contract between plaintiffs and defendants Universal and Alfa-Laval. We note that this issue was not raised in the trial court or in the Court of Appeals and thus is not properly before us. We also note in each case that plaintiffs allege that the defendant retailer was an "agent" of the manufacturer.

economic losses resulting from the commercial sale of goods, the plaintiffs' exclusive remedies are provided by the UCC. Because proceedings in each case were not commenced within the four-year period provided by MCL 440.2725; MSA 19.2725, the actions are time-barred. Accordingly, in each case, we affirm the decision of the Court of Appeals.

BRICKLEY, RILEY, and MALLETT, JJ., concurred with GRIFFIN, J.

LEVIN, J. (*dissenting*). The plaintiffs are dairy farmers. They seek in these actions to recover for injury to their herds claimed to have been caused by defects in automated milking systems purchased from the defendant manufacturers and their representatives.

The circuit judge granted the defendants summary disposition, and the Court of Appeals affirmed.[1]

The question presented is whether the plaintiff dairy farmers may maintain an action in tort for property loss. The majority holds that their exclusive remedy is an action for breach of warranty under the Uniform Commercial Code, and that an action in tort cannot be maintained for property loss, at least where the loss is deemed to be within the commercial or economic expectation of the parties.[2]

The dairy farmers commenced these actions more than four years after delivery of the automated milking systems.[3] They did not press a

---

[1] There is no record concerning the nature of plaintiffs' damages. It *does appear that some cows died.*

[2] *Ante,* pp 533, 520.

[3] The UCC provides:

claim for breach of implied warranty under the UCC,[4] it apparently being assumed that the four-year statute of limitations for commencement of such an action had expired.[5]

> (1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than 1 year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warrant explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. [MCL 440.2725; MSA 19.2725.]

[4] In *Warner v A O Smith Corp,* the plaintiffs obtained a jury verdict based on failure to warn, for damage to the herd resulting from defective feed-storage system. The Court of Appeals affirmed in an unpublished opinion. This Court granted leave to appeal, limited to the issue whether the economic loss doctrine applies in the case, 437 Mich 928 (1991), and, after the case was argued together with the instant cases in October, 1991, the order granting leave was dismissed as improvidently granted, 439 Mich 945 (1992).

[5] Most courts that have considered the question have held that the UCC statute of limitations runs without regard to the time of discovery of a cause of action. See Schmitt & Hanko, *For whom the bell tolls—An interpretation of the UCC's exception as to accrual of a cause of action for future performance warranties,* 28 Ark L R 311, 314-319 (1974).

In *Parish v B F Goodrich Co,* 395 Mich 271, 282; 235 NW2d 570 (1975), this Court said that the purpose of the statute was "to commence the running of the four-year limitational period, applicable to UCC contract of sale actions, *instanter* upon tender of delivery." (Emphasis in original.) See also *Allen v Todd,* 6 NY Lans 222 (1872); *Bogardus v Wellington,* 27 Ont App Rep 530 (1900); *E O Painter Fertilizer Co v Kil-Tone Co,* 105 NJL 109; 143 A 332 (1928); *Rockwell Co v Lundquist Hardware Co,* 143 Conn 684; 125 A2d 173 (1956); *Citizens Utilities Co v American Locomotive Co,* 11 NY2d 409; 230 NYS2d 194; 184 NE2d 171 (1962); *Liberty Mut Ins Co v Sheila-Lynn Inc,* 185 Misc 689; 57 NYS2d 707 (1945), aff'd 270 AD 835; 61 NYS2d 373 (1946); *Matlack, Inc v Butler Mfg Co,* 253 F Supp 972 (ED Pa, 1966).

There is, however, authority to the contrary. See Schmitt & Hanko, *supra,* pp 319-323; *Romano v Westinghouse Electric Co,* 114 RI 451; 336 A2d 555 (1975); *Mittasch v Seal Lock Burial Vault, Inc,* 42 AD2d 573; 344 NYS2d 101 (1973); *Sewall Paint & Glass Co of Texas v Booth Lumber & Loan Co,* 34 SW2d 650 (Tex Civ App, 1930); *Ingalls v*

We would hold that the plaintiffs may maintain an action in tort. While a tort action must be commenced within three, not four, years of accrual of the claim, the action does not accrue before the plaintiff should have discovered the claim.

I

The relationships between the plaintiff dairy farmers and the defendant manufacturers/representatives arose out of the sale of goods, automated milking systems. Manufacturers and sellers of goods have sought to confine persons who suffer damage as a result of product defect to the remedy for breach of implied warranty provided in the sale of goods article of the Uniform Commercial Code.[6]

Courts throughout the land have considered whether the UCC provides the exclusive remedy for personal injury or death resulting from a product defect. There seems to be universal agreement that a tort action may be maintained to recover for personal injury or death resulting from product defect.[7]

---

*Angell,* 137 P 309 (Wash, 1913); *Firth v Richter,* 49 Cal App 545; 196 P 277 (1920); *Wilkinson v Harrington,* 104 RI 224; 243 A2d 745 (1968); *Dincher v Marlin Firearms Co,* 198 F2d 821, 823 (CA 2, 1952) (Frank, J., dissenting).

Because these actions were dismissed by summary disposition, the circumstances that might explain the delay in discovery or assertion of the claims against the defendant manufacturers/representatives do not fully appear. In another case, it might appear that the damage to other property justifies tolling of the statute of limitations, or permitting an action to be maintained in tort. The focus in the majority opinion on whether the loss was economic obscures the underlying statute of limitations issue.

[6] [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. [MCL 440.2314(1); MSA 19.2314(1).]

[7] See Prosser & Keeton, Torts (5th ed), § 98, p 693, White. &

A

Manufacturers have been somewhat more successful in limiting recovery where personal injury or death is not involved, and the loss is essentially economic.

There are two lines of authority. One line of authority, originally set forth in an opinion of the California Supreme Court, *Seely v White Motor Co,* 63 Cal 2d 9; 403 P2d 145 (1965), and adopted by most courts that have considered the matter,[8] precludes maintenance of a tort action, and confines the purchaser to an action for breach of warranty under the UCC, where the damage is essentially to the defective product sold by the seller *and no other property is damaged.* That is the view adopted by the United States Supreme Court in *East River Steamship Corp v Transamerica Delaval Inc,* 476 US 858; 106 S Ct 2295; 90 L Ed 2d 865 (1986).

The second line of authority, originally set forth in an opinion of the New Jersey Supreme Court, *Santor v A & M Karagheusian, Inc,* 44 NJ 52; 207 A2d 305 (1965), permits a purchaser of a defective product to maintain a tort action for loss of the defective product without regard to whether prop-

Summers, Uniform Commercial Code (2d ed), § 11-3, p 401, *Pennsylvania Glass Sand Corp v Caterpillar Tractor Co,* 652 F2d 1165, 1168 (CA 3, 1981), *East River Steamship Corp v Transamerica Delaval Inc,* 476 US 858, 866; 106 S Ct 2295; 90 L Ed 2d 865 (1986), *Santor v A & M Karagheusian, Inc,* 44 NJ 52, 59; 207 A2d 305 (1965), *Seely v White Motor Co,* 63 Cal 2d 9, 18; 403 P2d 145 (1965), and 2 Restatement Torts, 2d, § 402A(1).

[8] See, e.g., *Miehle Co v Smith-Brooks Printing Co,* 303 F Supp 501 (D Colo, 1969); *Hagert v Hatton Commodities, Inc,* 350 NW2d 591 (ND, 1984); *Nebraska Innkeepers, Inc v Pittsburgh-Des Moines Corp,* 345 NW2d 124 (Iowa, 1984); *Clark v Int'l Harvester Co,* 99 Idaho 326; 581 P2d 784 (1978); *Morrow v New Moon Homes, Inc,* 548 P2d 279 (Alas, 1976); *Signal Oil & Gas Co v Universal Oil Products,* 572 SW2d 320 (Tex, 1978).

erty other than the defective product is also damaged by reason of the defect.[9]

Under either of the established lines of authority, *Seely/East River* or *Santor,* the purchaser may maintain an action in tort where the product defect causes damage to other property. Accordingly, under either established line of authority, this action may be maintained because plaintiffs claim injury to their dairy herds, property other than the purchased automated milking system.[10]

B

The majority relies, not on a line of authority,

---

[9] See, e.g., *Pennsylvania Glass Sand Corp,* n 7 *supra,* where the buyer of front-end loader was permitted to recover in tort for fire damage to the purchased product, the loader, resulting from design defect.

Those courts thus do not distinguish between an action for personal injury or for property damage, taking the view that the UCC provides an additional remedy for product defect that is not exclusive of other remedies.

The Restatement provides:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, *or to his property* . . . . [2 Restatement Torts, 2d, § 402A(1), pp 347-348. Emphasis added.]

> Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales. [*Id.,* comment m, p 355.]

[10] There is thus no need to choose, in a dissenting opinion, between the two lines of authority.

but on a decision of a nisi prius court, the United States District Court for the District of South Dakota, *Agristor Leasing v Spindler,* 656 F Supp 653, 654 (D SD, 1987), and a decision of the Minnesota Supreme Court, *Hapka v Paquin Farms,* 458 NW2d 683, 688 (Minn, 1990).

In *Agristor,* the court ruled that a tort action could not be maintained for lost profits claimed to have been caused by the malfunctioning of a feed-storage system.

In *Hapka,* the court ruled that a tort action could not be maintained for damage to a potato field claimed to have been caused by the sale of seed potatoes infected with ring rot; the disease had been spread by the purchasers' farm equipment from one field to another.[11]

The court in *Agristor,* rather than disagreeing with *Seely,* noted that the *Seely* approach had been followed by the majority of jurisdictions,[12] and sought to distinguish *Seely* on the basis that the plaintiff in *Agristor* sought primarily to recover lost profits.[13] In the instant cases, permanent damage to other property, the dairy herd, is claimed.

---

[11] One justice dissented on the basis that plaintiffs had suffered damage to "other property," and should have been allowed to recover in tort pursuant to *Seely/East River. Hapka, supra,* p 688 (Yetka, J., dissenting).

[12] Finally, it is relevant to note that the majority of jurisdictions that have considered this issue have followed the California Supreme Court's holding in *Seely v White Motor Company.* [*Agristor, supra,* p 656.]

Among the cases cited with apparent approval in *Agristor, supra,* p 657, is *Signal Oil & Gas Co,* n 8 *supra,* where recovery in tort was permitted for destruction of a significant portion of an oil refinery resulting from a fire caused by the explosion of a defective heater.

[13] The court noted that "the South Dakota legislature broadly views privity under the Uniform Commercial Code," and it is consequently "unnecessary for South Dakota courts to expand strict liability theories to cover economic losses." *Agristor, supra,* p 656.

In *Hapka,* the court, in refusing to allow tort
recovery, held that "the Uniform Commercial
Code must control exclusively with respect to dam-
ages in a commercial transaction which involves
property damage only," where the parties are
commercial purchasers who regularly acquire the
product, persons "knowledgeable and of relatively
equal bargaining power" as the sellers.[14] It does
not appear that the plaintiffs in the instant cases
were experienced or regular buyers of automated
milking systems.

The court in *Hapka* said that the UCC remedy is
"something less than adequate in the ordinary
consumer transaction."[15] It expressly reaffirmed
the availability of actions for strict products liabil-
ity and negligence, as well as for breach of war-
ranty, in an ordinary consumer transaction.[16] It
thus appears that the court in *Hapka* would have
reached a result opposed to the result reached by
the majority in the instant cases had the court
there been presented with the instant cases.[17]

---

[14] *Hapka, supra,* p 688.

[15] Generally speaking, a consumer has neither the skill nor the
bargaining power to negotiate either warranties or remedies. If
a defective coffee pot causes a fire which *destroys a consumer's
home,* the panoply of liability theory should be available to the
consumer—strict products liability and negligence as well as
breach of warranty—whether or not personal injuries accom-
pany the property damage. [*Id.* Emphasis added.]

[16] *Id.*

[17] Minnesota, like South Dakota, had adopted a liberal privity
alternative of the UCC:

Minnesota, on the other hand, has adopted the most liberal
privity alternative of the Uniform Commercial Code, so it is
unnecessary for Minnesota courts to "stretch" strict liability to
cover economic losses. Such losses are recoverable under war-
ranty theories. [*Agristor, supra,* p 656.]

The Minnesota Legislature has, as the majority points out,
amended its statute following *Hapka. Ante,* p 532, n 28. Under the

II

The majority is troubled that under either the *Seely/East River* or *Santor* lines of authority, actions may be maintained under more than one theory, a products liability action in tort as well as a warranty action under the UCC. The drafters of the UCC were not so troubled.[18] Nor are courts throughout the land that have allowed recovery in tort where there is damage to other property.[19]

A purpose in enacting a *Uniform* Commercial Code is to provide uniformity in the law. *Agristor* and *Hapka,* relied on by the majority, are distinguishable. In *Agristor,* there was no permanent

modified statute, a purchaser like the dairy farmers in the instant cases would be able to recover in tort for economic loss because the damage is to tangible property other than the goods sold, and the dairy farmers are not "merchants in goods of the kind."

[18] Unless displaced by the particular provisions of this act, the principles of law and equity . . . supplement its provisions. [MCL 440.1103; MSA 19.1103.]

[N]or does this article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers. [MCL 440.2102; MSA 19.2102.]

Of particular interest is the following commentary:

Do these [Article 2] provisions not only provide for recovery under Article 2 but also imply that this recovery has become the sole available remedy, supplanting any action in tort? It is well to recall that these two provisions are not new but are merely declaratory of the common law and the corresponding provisions of the Uniform Sales Act. At common law, the action for breach of implied warranty—awarding recovery for physical injury on the basis of consequential damages—existed side by side with the tort action for putting a dangerous product on the market, with recovery for physical damages as the principal basis of the action. The same is true of the relationship between the two causes of action under the Uniform Sales Act. If the Code made no ostensible change in this aspect of the law in other respects, why should it be held abruptly to preëmpt the tort action? [Wade, *Tort liability for products causing physical injury and Article 2 of the UCC,* 48 Mo L R 1, 6 (1983).]

[19] See ns 7 and 8 and accompanying text.

damage to the other property, the herd, resulting
from the one-time purchase of a defective feed
storage system. In *Hapka,* the plaintiff was a
potato farmer, a regular commercial buyer of po-
tato seeds, who had purchased seed from other
suppliers in the same year he purchased the defec-
tive potato seeds from the defendant; this was not
a one-time purchase.

The approach of the majority in the instant
cases, in refusing to allow recovery in tort for loss
of other property resulting from a one-time pur-
chase of defective equipment, is not in accord with
the concept of uniformity in law underlying the
UCC.

A

The majority cites cases that, on examination,
permit maintenance of a tort action where, as
here, there is damage to other property.[20]

Michigan Court of Appeals cases, and federal
court cases applying Michigan law, cited by the
majority as indicative of the "regular" invocation
of the economic loss doctrine,[21] concern factual
situations where purchasers did not suffer damage
to *other* property.[22]

---

[20] *Ante,* p 530. See *Nat'l Union Fire Ins Co of Pittsburgh v Pratt &
Whitney Canada, Inc,* 107 Nev 535; 815 P2d 601, 603 (1991), recogniz-
ing that damage to an apartment complex caused by defective con-
struction materials was recoverable in tort; *Kershaw Co Bd of Ed v
United States Gypsum Co,* 302 SC 390; 396 SE2d 369 (1990), recovery
in both contract and tort was allowed where damage to school
building was caused by acoustical ceiling plasters.

[21] *Ante,* pp 523-527.

[22] In *McGhee v General Motors Corp,* 98 Mich App 495; 296 NW2d
286 (1980), the injury claimed was damage to the purchased goods
themselves and the costs of repair of such damage. In *A C Hoyle Co v
Sperry Rand Corp,* 128 Mich App 557, 559; 340 NW2d 326 (1983), the
Court did not address a factual situation involving damage to other
property resulting from a product defect—"Plaintiff did not allege
that the motors were themselves damaged by virtue of their defect,

**B**

The majority's reliance on *Seely* as support for its view of the economic loss doctrine[23] is misplaced. The plaintiff there sought to recover for damage to a truck allegedly caused by a defective tire. The court in *Seely* premised its refusal to allow the plaintiff to recover in tort on the absence of proof that the damage to the truck was in fact caused by the tire defect.[24] The court said that had causation been entitled, plaintiff would have been allowed to recover in tort for damage to the truck.[25]

The majority's reliance on *East River* is also misplaced.[26] The plaintiff there sought to recover in tort for damage to the purchased product, a steamship turbine, arising from product defect—

nor did plaintiff allege that the motors caused physical injury to persons or other property." In *Great American Ins Co v Paty's, Inc,* 154 Mich App 634, 636; 397 NW2d 853 (1986), the damage alleged was destruction of the purchased product, a farmer's combine—"The complaint did not allege any injury to person or property other than the combine itself."

Similarly, in *Sylla v Massey-Ferguson, Inc,* 660 F Supp 1044 (ED Mich, 1984), and *Consumers Power Co v Mississippi Valley Structural Steel Co,* 636 F Supp 1100 (ED Mich, 1986), the courts were not addressing claims of damage to other property arising from a product defect, but rather claims seeking recovery for damage only to the purchased product.

In *Frey Dairy v A O Smith Harvestore Products, Inc,* 680 F Supp 253 (ED Mich, 1988), aff'd on other grounds 886 F2d 128 (CA 6, 1989), the court addressed a claim of economic loss arising out of defective silos causing reduced milk production and lost profits. Damage to other property or personal injury was not alleged.

[23] *Ante,* p 527.

[24] *Seely, supra,* p 19.

[25] Plaintiff contends that, even though the law of warranty governs the economic relations between the parties, the doctrine of strict liability in tort should be extended to govern physical injury to plaintiff's property, as well as personal injury. We agree with this contention. Physical injury to property is so akin to personal injury that there is no reason to distinguish them. [*Id.*]

[26] *Ante,* p 527.

damage to other property was not alleged. In rejecting tort recovery, the United States Supreme Court observed that "[i]n this case, there was no damage to 'other' property."[27] The Court went on to adopt the view expressed in the *Seely* line of authority that permits recovery where there is damage to other property.[28]

C

In *Superwood Corp v Siempelkamp Corp,*[29] cited by the majority,[30] the Minnesota Supreme Court held that a person may recover in tort where damage to other property arises out of a product defect.[31]

In *Clark v Int'l Harvester Co,*[32] cited by the majority,[33] the Supreme Court of Idaho observed, in refusing to allow recovery in tort, that plaintiff sought "recovery only of lost profits . . . and the costs of repairing and replacing allegedly defective parts."[34] The court went on to adopt the *Seely* view allowing tort recovery where there is damage to other property arising from product defect.[35]

III

It does not appear whether, absent express con-

[27] *East River, supra,* p 867.

[28] *East River, supra,* p 871.

[29] 311 NW2d 159 (Minn, 1981), overruled by *Hapka v Paquin Farms, supra.*

[30] *Ante,* p 528, n 23.

[31] *Superwood Corp,* n 29 supra, p 162.

[32] *Clark,* n 8 supra.

[33] *Ante,* p 529, n 24.

[34] *Clark,* n 8 supra, p 332.

[35] We believe the rule advanced by the majority of the jurisdictions and by the Restatement is sound for the reasons articulated by Justice Traynor in *Seely.* [*Clark,* n 8 supra, p 334.]

tractual provision, the damages recoverable for
breach of warranty in a case such as this could
differ significantly from the damages that would be
recoverable in a tort action under either the
*Seely/East River* or *Santor* lines of authority.[36]

The principal significance of the Court's decision
today may be to establish, absent personal injury,
a four-year statute of limitations for commence-
ment of an action claiming loss of property arising
out of the sale of defective goods or products, at
least where the loss is deemed to be within the
commercial or economic expectation of the parties.

CAVANAGH. C.J., and BOYLE, J., concurred with
LEVIN, J.

---

[36] It appears that recovery in contract for consequential economic
loss—including loss of profits, loss of good will or business reputation
and other loss proximately resulting from a defective product beyond
direct economic loss (loss of bargain, cost of repair, replacement cost,
and the like)—is neither authorized nor barred by the UCC. See White
& Summers, Uniform Commercial Code (2d ed), § 11-6, p 409. This
text reports that the vast majority of courts do not allow nonprivity
consumer purchasers to recover for consequential economic loss. *Id.*

Federal courts that have applied Michigan law have, however,
concluded that consequential damages, including lost profits, are
recoverable for breach of implied warranty. See *Martin v Joseph
Harris Co,* 767 F2d 296 (CA 6, 1985), holding that farmers whose
potential profits were reduced as a result of defective cabbage seeds
supplied by a corporate seed producer could recover for breach of an
implied warranty of merchantability; *Upjohn Co v Rachelle Labora-
tories, Inc,* 661 F2d 1105 (CA 6, 1981), holding that a marketer of
pharmaceuticals was clearly entitled to recover on the basis of breach
of implied warranty for lost profits from future sales of a prescription
drug that was defective.

See also Henszey, *Application of UCC Section 2-725 (statute of
limitations) to products liability cases—Does it make sense?,* 9 UCC
L J 379, 382 (1977), implying that consequential damages can be
recovered under the UCC.