FARM BUREAU MUTUAL INSURANCE COMPANY v COMBUSTION
RESEARCH CORPORATION
MIDWEST DIESEL, INC v COMBUSTION RESEARCH CORPORATION

Docket Nos. 234189, 235932. Submitted March 12, 2003, at Detroit.
Decided March 18, 2003, at 9:10 A.M.

Farm Bureau Mutual Insurance Company, as subrogee of Midwest
Diesel, Inc., and Midwest Diesel, Inc., brought actions in the Oak-
land Circuit Court against Combustion Research Corporation, seek-
ing damages resulting from a fire that started when a heater manu-
factured by Combustion Research, which heater was sold to Michi-
gan Infrared Heating Company (MIHC), which in turn sold the heater
to Midwest and installed it, ignited a wall in Midwest's building
through which a portion of the heater passed. The defendant
claimed that the actions arose out of the sale of goods and there-
fore were governed by the Uniform Commercial Code's four-year
period of limitation and the economic-loss doctrine. The plaintiffs
alleged that they were not claiming that the heater was defective,
but that an employee of the defendant failed to properly inspect,
discover, and disclose the hazardous installation of the heater
when the employee visited Midwest twenty-two months after MIHC
purchased the heater, and, therefore, their actions were based on
tort and the UCC's statute of limitations was inapplicable. The court,
Alice L. Gilbert, J., agreed with the defendant and granted summary
disposition in favor of the defendant in each action. The plaintiffs
appealed. The appeals were consolidated.

The Court of Appeals *held*:

1. An injury caused by a service does not arise out of a transac-
tion in goods and is not subject to the remedy provisions, including
the statute of limitations, contained in the UCC.

2. The lack of a contract between Midwest and the defendant
does not require removal of this matter from the confines of the
UCC because privity of contract is not required.

3. No claim that the defendant failed to properly inspect and
warn could have arisen out of the sale of the heater to Midwest
because there was no contractual duty or obligation on the part of
the defendant to install, inspect, and service the heating unit aris-
ing out of the sale of the heater by MIHC to Midwest. However, a

duty to properly inspect the heater and warn of any dangers, a breach of which duty could serve as the basis for a tort action, may have arisen as a result of the defendant's employee's visit to Midwest twenty-two months after the sale. This issue of fact must be determined by the trier of fact. The trial court erred in granting summary disposition in favor of the defendant in each action.

Reversed and remanded.

TORTS — SERVICES — UNIFORM COMMERCIAL CODE.

An injury that results from the rendition of a service does not arise out of a transaction in goods and, therefore, is not subject to the remedy provisions, including the statute of limitations, contained in the Uniform Commercial Code (MCL 440.2725).

*Patrick, Johnson & Mott, P.C.* (by *John C. Patrick, Jr.,* and *Catherine L. Coash*), for Farm Bureau Mutual Insurance Company.

*Gary M. Collins* for Midwest Diesel, Inc.

*Mulcahy, Casey & Mulcahy, P.C.* (by *Brian J. Casey*), for the defendant.

Before: COOPER, P.J., and MURPHY and KELLY, JJ.

PER CURIAM. In these consolidated appeals, plaintiffs appeal by right from the circuit court's judgments granting defendant Combustion Research Corporation summary disposition pursuant to MCR 2.116(C)(7).[1] We reverse and remand.

These actions arise out of a fire at a business owned and operated by plaintiff Midwest Diesel, Inc. (Midwest). Plaintiffs alleged that the fire was started when a heater, manufactured by defendant, ignited a wall through which a portion of the heater referred to

[1] For purposes of this opinion, further reference to "defendant" shall pertain to Combustion Research unless otherwise indicated. The remaining defendants are not involved in these appeals, and it appears that bankruptcy and settlement have disposed of claims related to those defendants.

as a "fire tube" passed. Plaintiff Farm Bureau Mutual Insurance Company (Farm Bureau) was the insurer of Midwest and paid Midwest $406,995 as a result of the fire and pursuant to an insurance policy. Upon this payment, and pursuant to the terms of the insurance policy, Farm Bureau became subrogated, to the extent of its payment, to the rights of Midwest against defendant.

It is undisputed that defendant was the manufacturer of the radiant heater at issue, which it sold to Michigan Infrared Heating Company (MIHC). MIHC was owned by Gilbert Ham. The sale occurred on February 22, 1993. The unit was in turn sold to Midwest, and Ham provided installation of the heater. Ham stated that a portion of the heater was installed outside the building, requiring the fire tube to pass through a combustible wall. The record indicates that shortly after its installation, the heater began to malfunction by "shorting out." The record also reflects that Steven Spencer, president of Midwest, contacted Ham on a number of occasions in an effort to remedy the problem. Spencer noted that on December 1, 1994, he noticed smoldering inside the building and called defendant, who referred him to Dee Cramer, Inc. (Cramer), a heater-repair firm.

Kevin Kelly, a technician for Cramer, testified at his deposition that on December 2, 1994, he went to Midwest and found the installation of the heater to be what he considered atypical because the heater's fire tube passed through a combustible wall. According to Kelly, because of the irregularity of the installation, he called defendant and asked that a representative inspect the installation in order to determine its safety. Kelly's work invoice indicated that defendant's

employee, Craig Thornton, visited Midwest that same day. Specifically, the Cramer invoice states that "customer had problems with installation" and that Kelly "called Craig Thornton from Combustion Research. He met me here to check system. We repaired . . . and checked operation and installation." According to Kelly, on the basis of this inspection, Thornton approved the installation.

Thornton, however, denied telling Kelly that the installation was appropriate. Thornton explained that Kelly had only been concerned about "water getting on a burner," and denied being asked about the advisability of a fire tube passing through a combustible wall. Defendant denied that it installed, serviced, repaired, or inspected the heater. Defendant now concedes that Thornton did visit Midwest on the day in question, but alleges that Thornton did so only as a "public relations visit" and not to inspect the heater. Specifically, defendant argues that Thornton went to Midwest in an attempt to mollify the dispute that had occurred between Steven Spencer of Midwest and Gilbert Ham.

In December 2000, defendant filed motions for summary disposition pursuant to MCR 2.116(C)(7) and (10). According to defendant, plaintiffs' remaining claim arose from defendant's manufacture and sale of the heater, and there was "no question that [it] did not install, service or otherwise have anything to do with the placement of the heater." Accordingly, defendant argued that plaintiffs' actions arose solely out of the sale of goods and were therefore governed by the Uniform Commercial Code (UCC), MCL 440.1101 *et seq.*, and *Neibarger v Universal Coops, Inc*, 439 Mich 512, 534; 486 NW2d 612 (1992). Consequently,

defendant argued that the claim was barred by the UCC's four-year period of limitation, MCL 440.2725, and by the economic-loss doctrine.[2]

In response to the motions, plaintiffs insisted that the only claim they were pursuing against defendant was that defendant failed to properly inspect, discover, and disclose the hazardous installation of the heater during Thornton's visit on December 2, 1994, emphasizing that they were not claiming that there was a defect in the product itself. On this basis, plaintiffs insisted that their claim was one based in tort, and not contract; therefore, the UCC's statute of limitations was not applicable. Further, plaintiffs emphasized what they considered a conflict in the evidence regarding whether defendant inspected the heater and its installation, and that this conflict barred summary disposition.

The trial court granted defendant's motions on the ground that plaintiffs' cause of action was barred by the UCC's statute of limitations and the economic-loss doctrine.

On appeal, plaintiffs argue that the trial court erred in relying on the economic-loss doctrine and the UCC's four-year period of limitation in summarily disposing of their actions. We agree.

This Court reviews de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(7). *DiPonio Constr Co, Inc v Rosati Masonry Co, Inc*, 246 Mich App 43, 46; 631 NW2d 59

---

[2] In *Neibarger, supra* at 527-528, our Supreme Court formally adopted the "economic loss doctrine," which provides that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations."

(2001). In determining whether a party is entitled to judgment as a matter of law pursuant to MCR 2.116(C)(7), a court must accept as true a plaintiff's well-pleaded factual allegations, affidavits, or other documentary evidence and construe them in the plaintiff's favor. *Brennan v Edward D Jones & Co*, 245 Mich App 156, 157; 626 NW2d 917 (2001). Where there are no factual disputes and reasonable minds cannot differ on the legal effect of the facts, the decision regarding whether a plaintiff's claim is barred by the statute of limitations is a question of law that this Court reviews de novo. *Id.*

The statute of limitations involving transactions for the sale of goods is set forth in MCL 440.2725, which states, in pertinent part:

> (1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than 1 year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warrant explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

However, an injury caused by a service does not arise out of a "transaction in goods" and is not subject to the remedy provisions, including the statute of limitations, contained in the UCC. *Higgins v Lauritzen*, 209 Mich App 266, 269; 530 NW2d 171 (1995).

Plaintiffs seek to avoid the time limits set forth in MCL 440.2725, and instead wish to rely on statutes of limitations applicable to general tort actions. The only issue presented and argued to us concerns whether the UCC's statute of limitations is applicable under the circumstances of these cases; therefore, we shall not address whether plaintiffs' cause of action is maintainable under statutes of limitations outside the UCC. Additionally, we shall not address whether the UCC's statute of limitations, if applicable, was properly found to bar these actions, where plaintiffs have not made that argument on appeal.

We are confronted with cases in which defendant did not sell the heater directly to Midwest and did not install the unit, nor are plaintiffs seeking to hold defendant liable for selling a defective product or for negligently installing the unit. Rather, plaintiffs seek to hold defendant liable for an alleged service call occurring approximately twenty-two months after the sale of the product based on a failure to recognize the allegedly improper installation completed by MIHC and failure to warn Midwest of the danger. We find that the ultimate issue for us to determine is whether the act by Thornton in visiting Midwest was sufficiently distinct from the sale of the heating unit and any contractual obligations related to the sale so as to remove the cases from the UCC, and we must simultaneously consider whether Thornton's actions could give rise to a separate claim predicated on tort law for failure to warn or disclose.

In *Neibarger, supra* at 520-521, our Supreme Court stated:

> The economic loss doctrine, simply stated, provides that
> " '[w]here a purchaser's expectations in a sale are frustrated

because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.' " This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. [Alteration in original; citations omitted.]

The *Neibarger* Court noted that "[w]here a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort fail to serve the purpose of encouraging the design and production of safer products." *Id.* at 523.

Initially, we find that the lack of any contract between Midwest and defendant with respect to the sale of the heater does not require removal of these cases from the confines of the UCC; privity of contract is not required. *Citizens Ins Co v Osmose Wood Preserving, Inc*, 231 Mich App 40, 45; 585 NW2d 314 (1998).

Next, we address plaintiffs' contention that they never claimed that the heater itself was defective, but instead claimed that their actions revolved around the improper installation of the unit and subsequent inspection of the improperly installed heater. In *Neibarger, supra* at 537, a case involving milking systems that did not operate properly resulting in illness and death to the plaintiffs' dairy herds, the plaintiffs argued, in part, that "there was no defect in the product," but instead the product was poorly installed. The Supreme Court rejected the argument stating that "[a]t the heart of the complaints in these cases is the

fact that the plaintiffs purchased products which proved inadequate for their purposes, causing them lost profits and, perhaps, consequential losses or property damage compensable in a timely suit under the provisions of the UCC." *Id.* It is difficult to distinguish the argument made and rejected in *Neibarger* from the argument presented by plaintiffs here.

The predominant nature or purpose of the underlying commercial transactions between defendant and MIHC, and MIHC and Midwest, clearly concerned the sale of goods, the heater, and not services. As stated by the Supreme Court in *Neibarger, supra* at 536-537:

> It is difficult to imagine a commercial product which does not require some type of service prior to its purchase, whether design, assembly, installation, or manufacture. If a purchaser were able to avoid the UCC by pleading negligent execution of one of the services required to produce the product, Article 2 could be easily and effectively negated. A court faced with this issue should examine the purpose of the dealings between the parties. If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though goods are incidentally required in the provision of this service.
>
> In these cases, the thrust or purpose of the plaintiffs' contracts with the defendants was not the provision of defendants' design or installation services; rather, the plaintiffs intended to acquire goods, i.e., milking systems that incidentally required design and installation services.

The language in *Neibarger* suggests that the UCC would be applicable in the cases sub judice even if plaintiffs' claim was predicated on the improper installation of the heater and on services; however,

we are confronted with a twist, i.e., services by defendant long after the sale, that being Thornton's visit to Midwest, and not incidental services performed before or at the time of the sale.

In *Osmose, supra* at 41-42, the plaintiff, as subrogee of a company that owned a restaurant that was heavily damaged when the roof collapsed, alleged negligence against the defendant, where wood trusses and roof decking treated with fire-retardant chemicals manufactured by the defendant and installed by a builder caused the collapse. This Court, addressing the question whether the UCC's statute of limitations was applicable, ruled:

> The problem with plaintiff's argument is that it misapprehends *defendant's* role in the transactions at issue: defendant merely provided the chemicals and accompanying instructions used by *another* company to treat the wood installed in [the] restaurant. Importantly, we note that defendant is being sued only as a *manufacturer.* . . . Because defendant provided only its wood-treatment product that, in turn, was applied to the wood used in the trusses and roof decking, we conclude that plaintiff's causes of action against defendant are governed by the UCC. [*Id.* at 45-46 (emphasis in original).]

Here, there are parallels to *Osmose* because defendant manufactured the heating unit and sold it to another company, MIHC, who in turn sold the heater to Midwest and also installed the unit for Midwest. However, defendant's role in the present cases was not solely as a manufacturer who merely supplied the heater and accompanying installation instructions;[3]

---

[3] We note that plaintiffs argue that the installation was improper, in part, on the basis of the claim that the installation was inconsistent with defendant's installation instructions.

rather, the role also included follow-up after the sale when Thornton visited Midwest.

We find instructive this Court's decision in *Home Ins Co v Detroit Fire Extinguisher Co, Inc,* 212 Mich App 522, 524; 538 NW2d 424 (1995), wherein the defendant contracted to supply a fire-extinguisher system in a manufacturing plant owned by one of the plaintiffs, Crown Group, Inc. The defendant installed the system pursuant to the contract; however, three months later, the defendant had to return to adjust the system after it accidentally discharged following a routine steam cleaning of the plant. *Id.* Subsequently, a fire occurred at the plant and the system failed to activate. *Id.* Crown Group and its insurer filed suit, alleging, in part, negligence and gross negligence "in the design, installation, inspection, and maintenance of the system[.]" *Id.* at 525. The circuit court ruled that the case involved the sale of goods under the UCC, and, thus, the tort claims were barred by the economic-loss doctrine. *Id.*

*The Home Ins* panel reversed and stated in pertinent part:

> Plaintiffs also argue that the circuit court erred in granting summary disposition to defendant arising out of defendant's postinstallation activities (additional servicing, including during the November 1986 investigation into the accidental discharge). Defendant counters that its actions were incidental to the original purchase and installation contract and gave rise to no additional duties.
>
> We find that the circuit court incorrectly limited defendant's duty on the basis of its findings that there was no oral or implied contract between defendant and plaintiff Crown for work or for maintenance to be performed on the system after its installation. An issue of material fact

remains regarding whether defendant owed Crown a duty of care upon which tort claims could be based.

*        *        *

When defendant serviced the system after installation was complete it knew, or should have known, that plaintiff Crown was relying on defendant to make the system operable upon completion of service. [*Id.* at 528-529.]

Here, we likewise find that there is an issue of fact regarding whether a duty to warn or disclose, based in tort law and apart from the sale of the heating unit and any related contractual obligations, arose out of Thornton's visit to Midwest. First, there is conflicting documentary evidence regarding the nature and extent of Thornton's visit to Midwest; therefore, it is appropriate for the trier of fact to resolve the factual conflict. Resolution of that underlying factual issue is necessary to determine whether a duty to warn arose from the visit. If the trier of fact determines that Thornton's visit was sufficient to support a finding that he knew, or should have known, that the installation was improper and dangerous, there may be tort liability for a failure to warn or disclose. Regardless, the UCC is not applicable. As defendant itself maintains, defendant was not contractually obligated to perform any services with respect to repairs or maintenance of the heating units it sold; defendant is purely a manufacturing company that sells its products through independent distributors. "[C]ase law expressly provides that an action in tort may not be maintained where a contractual agreement exists, unless a duty, separate and distinct from the contractual obligation, is established." *Sherman v Sea Ray Boats, Inc,* 251 Mich App 41, 52; 649 NW2d 783

(2002). Here, there was no contractual obligation or duty on the part of defendant to install, inspect, and service the heating unit arising out of the sale of the heater to Midwest. Therefore, no claim of failure to properly inspect and warn could have arisen out of the contractual sale of the heater. However, a duty to properly inspect the heater and warn of any dangers, a breach of which duty serving as the basis for a tort claim, may have arisen solely from defendant's action in visiting Midwest. Moreover, the visit to Midwest by Thornton twenty-two months after the sale cannot be deemed the rendition of services incidental to the sale of the heating unit as envisioned by the *Neibarger* Court because the discussion in *Neibarger* related to services rendered before or at the time of the sale.[4]

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.[5]

---

[4] It would appear to be ultimately irrelevant to these appeals whether an issue of fact exists concerning Thornton's visit to Midwest because the trial court dismissed the action on the basis of the UCC's statute of limitations and because no claim of failure to inspect and warn can be predicated on the sale of the heater. In other words, even if plaintiffs did not establish an issue of fact with respect to Thornton's visit, the UCC would not be implicated in light of the circumstances and the claim made, and plaintiffs' tort claim was apparently not dismissed, in general, for failure to state a claim or for failure to create a genuine issue of material fact. However, to the extent that the judgments of dismissal could be read in such a manner, we hold that an issue of fact does exist regarding Thornton's visit as discussed above.

[5] In light of our decision, it is unnecessary to address plaintiffs' title-object argument.