# STATE OF MICHIGAN

# COURT OF APPEALS

FREMONT INSURANCE COMPANY,

        Plaintiff-Appellant/Cross-Appellee,

and

STEVE FOLEY and DIANE FOLEY, d/b/a
RAINBOW CREEK FARMS,

        Appellants/Cross-Appellees,

<table>
<tr><td>v</td><td>No. 324075</td></tr>
<tr><td></td><td>Tuscola Circuit Court</td></tr>
<tr><td>GRO-GREEN FARMS, INC.,</td><td>LC No. 2011-026883-NZ</td></tr>
<tr><td>    Defendant-Appellee/Cross-<br>    Appellant.</td><td></td></tr>
</table>

UNPUBLISHED
March 17, 2016

Before: K. F. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

Plaintiffs appeal as of right from orders of the trial court granting defendant's motion for summary disposition and motion in limine. On appeal, plaintiffs argue that the trial court erred in granting defendant's summary disposition on plaintiffs' tort claims on the basis of the economic loss doctrine, erred in granting defendant's motion for summary disposition on the basis that plaintiffs failed to provide defendant with reasonable notice pursuant to MCL 440.2607(3)(a), and erred in granting defendant's motion in limine and prohibiting evidence relating to "clinkers." Defendant cross appeals as of right, asserting alternative grounds for affirmance of its motion for summary disposition and motion in limine, and disputing the trial court's denial of its motion to amend its witness list. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

This case arises from a fire that occurred on August 19, 2011, at Rainbow Creek Farms (Rainbow Creek) in Millington, Michigan. Rainbow Creek is a small dairy farm owned by plaintiffs Steve and Diane Foley. The Foleys lived a few miles away from the farm. Shortly after 7:00 a.m. on August 29, 2011, the Foleys were contacted by a neighbor and informed that there was significant smoke coming from the farm. The fire caused extensive damage to the farm. Plaintiff Fremont Insurance Company, subrogee, insured the farm, and paid benefits

-1-

amounting to $637,831.30. However, the Foleys were left with uninsured damages amounting to more than $612,000. Following the fire, an investigation was conducted. It was undisputed that the fire began in the northeasterly storage barn containing approximately 46 very large bales of straw, which were produced by defendant Gro-Green Farms, Inc., and sold to Rainbow Creek about two weeks before the fire.

Plaintiffs subsequently filed a complaint against defendant for negligence, breach of contract, and related claims. Generally, plaintiffs alleged that the straw bales were defective, which caused them to spontaneously combust and ignite the fire at Rainbow Creek. Ultimately, the trial court granted defendant's motion for summary disposition, in full, leading to this appeal.

Plaintiffs first argue that the trial court erred in granting defendant's motion for summary disposition regarding plaintiffs' tort claims because the claims were barred by the economic loss doctrine. We disagree. The trial court granted summary disposition on this basis pursuant to MCR 2.116(C)(10).

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Alcona Co v Wolverine Environmental Prod, Inc*, 233 Mich App 238, 245; 590 NW2d 586 (1998). A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id*. A motion under MCR 2.116(C)(8) "tests the legal sufficiency of the pleadings alone." *Nuculovic v Hill*, 287 Mich App 58, 61; 783 NW2d 124 (2010).

In *Neibarger v Universal Cooperatives, Inc*, 439 Mich 512; 486 NW2d 612 (1992), the Michigan Supreme Court adopted the economic loss doctrine, which provides that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the [Uniform Commercial Code (UCC)], including its statute of limitations." *Id*. The Court also addressed the application of the economic loss doctrine where the plaintiff asserted damage to property other than the goods themselves. The Court held:

> The proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages. The essence of a warranty action under the UCC is that the product was not of the quality expected by the buyer or promised by the seller. The standard of quality must be defined by the purpose of the product, the uses for which it was intended, and the agreement of the parties. In many cases, failure of the product to perform as expected will necessarily cause damage to other property; such damage is often not beyond the contemplation of the parties to the agreement. Damage to property, where it is the result of a commercial transaction otherwise within the ambit of the UCC, should not preclude application of the economic loss doctrine where such property

damage necessarily results from the delivery of a product of poor quality. [*Id*. at 531.]

Thus, "[w]here damage to other property was caused by the failure of a product purchased for commercial purposes to perform as expected, and this damage was within the contemplation of the parties to the agreement, the occurrence of such damage could have been the subject of negotiations between the parties." *Id*. at 532. In *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 47-50; 649 NW2d 783 (2002), this Court further extended the economic loss doctrine to cover individual consumer transactions in situations where the product merely failed to live up to the economic expectations held by the purchasers.

We agree with the trial court that the economic loss doctrine bars plaintiffs' tort claims. The parties were engaged in a commercial transaction, both parties being businesses. While there was damage to property other than the straw itself, the *Neibarger* Court explained that damage to property does not preclude application of the economic loss doctrine. *Neibarger*, 439 Mich at 531. In *Neibarger*, the plaintiff dairy farmer purchased a milking system from the defendant. *Id*. at 516. A defect in the milking system caused instances of mastitis in the plaintiff's cattle, causing loss of production of milk and damage to the cattle. *Id*. The Court held that the plaintiff's damages were properly considered an economic loss, and that their remedy lay in contract, not tort. *Id*. at 533. The Court explained that mastitis in cattle was a common problem for dairy farmers and that the plaintiff was aware mastitis could occur. *Id*. at 532-533. Here, the good at issue was straw, which caused a fire, inflicting property damage to plaintiffs' farm. The trial court held that "when dealing with straw, the parties would contemplate a loss due to fire, and that the occurrence of such damage would certainly have been the subject of negotiations between the parties." Indeed, plaintiffs, experienced farmers, presented testimony that fire caused by the spontaneous combustion of straw was a well-documented phenomenon. Further, common sense alone dictates that fire would be a possible consequence of dealing with straw, a relatively dry, flammable material. Accordingly, the economic loss doctrine bars plaintiffs' contract claims.

Plaintiffs present several cases to support their position that the parties would not contemplate a loss due to fire. However, as defendant points out, these cases involve transactions with individual consumers, not commercial transactions. Indeed, further review of these cases revealed that the subject of the analysis was whether the economic loss doctrine was applicable based on *Sherman*, 251 Mich App 41. Thus, these cases are not applicable. Accordingly, the trial court did not err in granting defendant's motion for summary disposition regarding plaintiffs' tort claims because the claims were barred by the economic loss doctrine.

Plaintiffs next argue that the trial court erred in granting summary disposition on the basis of MCL 440.2607(3)(a). We agree. The trial court granted summary disposition pursuant to MCR 2.116(C)(8) and (C)(10), concluding that plaintiffs' UCC claims were barred pursuant to MCL 440.2607(3)(a).

MCL 440.2607(3)(a) provides that "[w]here a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" As acknowledged by the trial court, "[w]hether a reasonable time has elapsed is generally a question for the trier of fact. If reasonable minds

-3-

could not differ, however, the question of what constitutes a reasonable time should be decided on summary disposition as a matter of law." *Bev Smith, Inc v Atwell*, 301 Mich App 670, 682; 836 NW2d 872 (2013) (citations omitted).

Here, the straw was delivered on August 4, 2011. Diane testified that, about a week after delivery, she noticed that the straw from one bale was moist. Diane did not contact defendant and continued using the straw. The fire occurred on August 19, 2011. Defendant was promptly notified of the fire. Defendant claims that, as a matter of law, plaintiffs failed to notify defendant of the defect within a reasonable time because Diane noticed the straw bale was wet. We disagree. Just over two weeks passed between delivery and plaintiffs notifying defendant of the alleged breach, whereas just over one week passed between Diane noticing the wet straw and the notification of the breach. Regardless of whether the breach was considered the delivery of the moist straw or the fire, there is a question of fact whether it was unreasonable for Diane not to notify defendant immediately. Plaintiffs purchased 46 bales of straw from defendant. On the day Diane noticed the wet straw, she handled two bales, only one of which was wet. It is possible that Diane thought only one bale would be wet, and would have contacted defendant later if it turned into a larger problem. Given the short amount of time that passed, the nature of the goods in question, and the large amount of product delivered, we do not agree that, as a matter of law, plaintiffs' notice was unreasonable as a matter of law. Accordingly, the trial court erred.

Plaintiffs next argue that the trial court abused its discretion in granting defendant's motion in limine regarding the admission of expert testimony on clinkers. We agree. This Court reviews for an abuse of discretion a trial court's decision to admit or bar expert testimony. *Gay v Select Specialty Hosp*, 295 Mich App 284, 290; 813 NW2d 354 (2012). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

Generally, clinkers are a mass of organic material created in hay or straw fires; a clinker was found in plaintiffs' barn following the fire. Defendants argued that evidence of clinkers was unreliable and inadmissible, and the trial court agreed. MRE 702 and MCL 600.2955 govern the admissibility of expert scientific testimony. MRE 702 sets out the requirements for the admission of expert testimony, and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Pursuant to MRE 702, the trial court must function as a gatekeeper in making decisions regarding the admissibility of scientific evidence and ensuring that expert testimony meets that rule's standard of reliability. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). In addition, MCL 600.2955 provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards for governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

The trial court "shall consider all of the factors listed in MCL 600.2955(1)." *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1068; 729 NW2d 221 (2007). The party offering the expert testimony has the burden of satisfying the preconditions established by MRE 702 and MCL 600.2955(1) and (2). *Gilbert*, 470 Mich at 781. In determining admissibility under the statutory standard, a court must consider the statutory factors, but not all of the facts need favor admissibility before the evidence may be admitted. Rather, the pertinent determination is whether a scientific opinion is rationally derived from a sound foundation. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127 (Davis, J.), 139 (Meter, J.); 732 NW2d 578 (2007).

Defendant also asked that the evidence be excluded pursuant to MRE 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

-5-

Evidence is not inadmissible simply because it is prejudicial. Clearly, in every case, each party attempts to introduce evidence that causes prejudice to the other party. *Waknin v Chamberlain*, 467 Mich 329, 334; 653 NW2d 176 (2002).

Below, the trial court granted defendant's motion in limine to exclude evidence regarding clinkers. The court explained:

> Here, plaintiff[s'] experts will be testifying that the presence of clinkers indicates that a fire was caused by spontaneous combustion. In *Kirk's Fire Investigation*, 5th Edition, which plaintiff[s'] experts rel[y] upon, it is stated that the presence of clinkers can be used to determine whether spontaneous combustion is the cause of the fire. However, defendant points out that in the 7th Edition of *Kirk's Fire Investigation*, the authors indicate that a lack of clinkers does not indicate an incendiary cause, and the presence of clinkers does not prove spontaneous combustion.

> Plaintiffs point to no other reliable principles or methods specifically regarding clinkers except for the deposition testimony of the expert themselves. With no other reliable principles or methods involving the clinkers theory, any testimony regarding clinkers will only confuse the issues and mislead the jury.

The *Kirk's Fire Investigation (Seventh Edition)* excerpt on clinkers states the following:

> One of the interesting artifacts of spontaneously ignited hay fires is the formation the "hay clinker[."] This glassy, irregular mass, gray to green in color, can be found throughout the pile wherever temperatures were the highest and most prolonged but are likely to be concentrated near the center. The clinker is composed of the inorganic residues of silicon, sodium, and calcium from the plant stems as well as impurities baled with the hay (soil, dust) fused into a glassy mass by the heat developed in the fire. Hicks has done an in-depth study of hay clinkers that strongly indicates that the inorganic constituents of various grasses may be linked to their propensity to form such glasses. [Aaron J. Hicks, *Hay Clinkers as Evidence of Spontaneous Combustion*, Fire & Arson Investigator (1998).] Recently, Tinsley, Whaley, and Icove performed a series of live fire experiments examining the formation of hay clinkers in externally ignited fires. [Andrew Tinsley, Michael Whaley, and David J. Icove, *Analysis of Hay Clinker as an Indicator of Fire Cause* (2010).] The result of that study indicated that the formation of hay clinkers is dependent on a variety of factors, none of which reliably indicate the origin or cause of the fire. Hay fires in pole barns with metal roofs may cause the formation of numerous large masses as opposed to a few smaller clinkers. Clinkers do not occur in all self-heating hay fires, so their absence cannot be taken as proof incendiary cause, and their presence should not be taken as proof of spontaneous origin. A hay clinker may be mistaken for the residue of an incendiary device, but it is innocuous. Elemental analysis is essential. It must also be remembered that spontaneous combustion is an easy decision to reach when the cause of the fire is not known. It seems certain that many fires that have been attributed to spontaneous combustion causes were

actually set.  [John D. DeHaan and David J. Icove, *Kirk's Fire Investigation (Seventh Edition)*, pp 214-215.]

Interestingly, plaintiffs attached an affidavit from DeHaan, co-author of *Kirk's Fire Investigation*.  In the affidavit, DeHaan explained that the Tinsley experiment produced large masses of charred organic material, rather than the gray-green glassy masses that he referred to in his original text.  Accordingly, he believed the study by Hicks, which evaluated the glassy clinkers, was a more applicable technique when considering the formation of glassy mineral content.  "Therefore, [the Tinsley experiment] cannot be interpreted as proof that true hay clinkers can be produced by direct (piloted) ignition of hay bales."  DeHaan concluded:

> As I point out in *Kirk's*, hay clinkers have not been found in some fires whose causes were otherwise identified as spontaneous combustion.  There is still much that is unclear about the formation of the glassy hay clinkers, but it is my opinion . . . that the prolonged high, center-of-mass temperatures typical of hay fires caused by self-heating are the primary factor in the production of the true glassy hay clinkers in susceptible fuels and are therefore of evidentiary value.

The crux of defendant's argument is that clinkers cannot conclusively show the cause of a fire.  Indeed, plaintiffs' experts admit that the existence of a clinker, alone, does not show that the cause of a fire was spontaneous combustion.  However, we do not agree that is a necessary determination in order for the evidence to be presented to the jury.  Based on the materials submitted, spontaneous combustion of hay and straw is a documented biological process.  Often, the formation of these clinkers is linked to and referenced in discussions surrounding spontaneous combustion, as in *Kirk's Fire Investigation*, which was relied upon by both parties.  Indeed, a glassy, worm clinker was formed here.  The fact that the existence of a clinker does not show, conclusively, that the fire was caused by spontaneous combustion is not fatal to the evidence.  *Chapin*, 274 Mich App at 127, 139.  If it were, summary disposition on the issue of causation in favor of plaintiffs would be more appropriate.  Rather, it appears the evidence regarding clinkers is relevant as a factor supporting the argument that the fire was caused by spontaneous combustion, as clinkers are often associated with such fires.  The fact that the clinker does not, by itself, prove the cause of the fire should certainly be an issue raised on cross-examination, but that does not render the evidence unreliable or misleading.  A publication is authoritative if it is an accepted source of expert information or advice.  It need not always provide absolute truth.  See *McCarty v Sisters of Mercy Health Corp*, 176 Mich App 593, 600; 440 NW2d 417 (1989).  The distinction could be explained to the jury through questioning and argument, or even a limited instruction if deemed appropriate by the trial court.

Moreover, the 2010 experiment by Tinsley, which certainly may be used to impeach plaintiffs' experts, MRE 707, does not, in our opinion, show that the consideration of clinkers is unreliable.  This is especially true considering the difference in the consistency and composition of the clinkers, which plaintiffs' expert David G. Howitt, Ph.D. explained was essential to distinguishing the Tinsley experiment results from the current case.  The clinker at issue here could certainly be used to demonstrate the nature of the clinker formed, and the jury could determine the weight of that distinction as it related to the fire and the scientific evidence.

Defendant also argues that there were no studies to show that spontaneous combustion was possible in straw. However, an article by plaintiffs' own expert witness provides: "Hay and straw can spontaneously combust under certain conditions. The most important factor is the moisture content of the hay or straw when it is baled." Dennis Murphy, *Fires in Hay and Straw*, p 25. Additionally, in *Kirk's Fire Investigation (Seventh Edition)*, the authors state that "the most common fires termed *spontaneous* are without a doubt those that are ignited in hay, grasses, bagasse, or other vegetation residues." DeHaan and Icove, *Kirk's Fire Investigation (Seventh Edition)*, p 213. In his article, Hicks explained, "Many organic compounds, including sawdust, animal, oils, plant fibers, manure, charcoal, coal, feed and grains, are subject to spontaneous heating." Hicks, *Hay Clinkers as Evidence of Spontaneous Combustion*, p 10. Defendant presented an article which provided that "Moisture content is the main factor that causes hay and straw to spontaneously combust." Linda M. Fetzer & Cheryl Skjolaas, *Preventing Fires in Baled Hay and Straw* (2014). Even the Tinsley study provides that self-heating may occur in a porous, organic material. Tinsley, *Analysis of Hay Clinker as an Indicator of Fire Cause*. Accordingly, we are not convinced that spontaneous combustion cannot occur in straw fires. Again, the fact that no specific studies have been done on spontaneous combustion in straw fires or that there are no documented instances of spontaneous combustion in straw would be a more appropriate inquiry for cross-examination.

Defendant also argues, in a cursory manner that is not addressed by his question presented or preserved below, that Kale DeMott, a competitor in the straw baling business and proposed expert witness for plaintiffs, should not be permitted to testify regarding common standards for baling straw. This issue was unaddressed by the trial court and, thus, unpreserved, so we need not address it. *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). However, we note that the evidence would be relevant to explain to the jury the straw baling process, as utilized by DeMott's business. MRE 401. Moreover, his experience in the field could qualify him as an expert witness. MRE 702. The process of baling straw is not one that would be familiar to most people, and it is likely that testimony explaining the process would be helpful to the jury. Plaintiffs are certainly not required to accept defendant's contentions regarding the proper baling of straw, as they allege that it was done improperly.

On cross appeal, defendant first argues alternative grounds for affirmance of its motion for summary disposition regarding plaintiffs' negligence claims. Because we agree with the trial court that the economic loss doctrine bars plaintiffs' negligence claims, it is unnecessary for us to address this issue.

Defendant next argues alternative grounds for affirmance of its motion for summary disposition of plaintiffs' breach of contract claims.[1] In the trial court, defendant argued that

---

[1] Plaintiffs assert that these arguments were waived because they were not asserted in defendant's answer or affirmative defenses. MCR 2.111(F). However, plaintiffs present no legal authority to show that the arguments raised were affirmative defenses or were required to be raised in defendant's answer. While the arguments may be unpreserved for appeal, defendant has not waived the ability to substantively argue against plaintiffs' UCC claims.

plaintiffs' UCC claims should be dismissed for failure to provide reasonable notice pursuant to MCL 440.2607. The trial court agreed and granted summary disposition on that basis. Defendant did not raise additional defenses to plaintiffs' UCC claims. Thus, this issue is unpreserved. However, we address a few of defendant's assertions in order to aid the trial court on remand.

In the trial court, plaintiffs brought claims for breach of express and implied warranty. As defendant points out, it seems that, based on the oral contract between the parties, a breach of implied warranty most appropriately applies. MCL 440.2314(1) provides that, unless otherwise excluded, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Merchantable goods must:

> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and(e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any. [MCL 440.2314(2).]

In addition, MCL 440.2315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Defendant argues that plaintiffs cannot prevail on their claim for breach of implied warranty for several reasons: plaintiffs accepted the goods pursuant to MCL 440.2606, plaintiffs failed to reject the goods pursuant to MCL 440.2602, and plaintiffs cannot show proximate cause necessary to recover consequential damages pursuant to MCL 440.2715.

In regard to these issues, we opine that plaintiffs have established a question of fact. MCL 440.2606 provides that acceptance occurs:

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of section 2602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

"Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." MCL 440.2602(1). Defendant argues that, as a matter of law, plaintiffs had a reasonable time to inspect the goods, failed to notify defendant after finding the defect, and continued to use the goods in a manner inconsistent with the seller's ownership.

Whether plaintiffs had a reasonable opportunity to inspect the goods and whether plaintiffs seasonably notified defendant that it rejected the goods are questions of fact for the same reasons discussed in relation to MCL 440.2307, *supra*. Again, just over two weeks had passed since defendant delivered 46 large bales of straw to plaintiffs. We cannot say, as a matter of law, that plaintiffs acted unreasonably in failing to notify defendant after finding one moist bale of straw, or that a reasonable amount of time for plaintiffs to inspect the straw bales had passed. Additionally, defendant asserts that plaintiffs began using the straw in a manner inconsistent with defendant's ownership. While plaintiffs admitted to using a few of the bales of straw, over 40 bales remained untouched in plaintiffs' barn. Moreover, even assuming plaintiffs did use the goods in a manner inconsistent with the seller's ownership, MCL 440.2606(c), there remains a question of fact whether plaintiffs failed to make an effective rejection and had a reasonable opportunity to inspect, MCL 440.2606(b), MCL 440.2602(1).

MCL 440.2715(2) provides:

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) *injury to person or property proximately resulting from any breach of warranty.* [Emphasis added.]

Comment 5 of MCL 440.2715 provides:

Subsection (2)(b) states the usual rule as to breach of warranty, allowing recovery for injuries "proximately" resulting from the breach. Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. *If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty.* [Emphasis added.]

Defendant asserts that because plaintiffs discovered the defect before the injury, they cannot show proximate cause. However, we disagree. Again, there is a question of fact whether the discovery that one bale of straw was moist would constitute discovery of a defect. Further, if the defect was not discovered, the issue of whether it was reasonable for plaintiffs to use the goods without sufficient inspection also presented a disputed question of fact.

Defendant next argues that the trial court abused its discretion when it failed to allow defendant to amend its witness list. We disagree. We review the trial court's denial of a request to amend a witness list for an abuse of discretion. *Tisbury v Armstrong*, 194 Mich App 19, 20; 486 NW2d 51 (1991). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry*, 486 Mich at 639.

MCR 2.401(l) addresses the filing of witness lists, stating:

(1) No later than the time directed by the court under subrule (B)(2)(a), the parties shall file and serve witness lists. . . .

(2) The court may order that any witness not listed in accordance with this rule will be prohibited from testifying at trial except upon good cause shown.

(3) This subrule does not prevent a party from obtaining an earlier disclosure of witness information by other discovery means as provided in these rules.

Here, we do not agree that the trial court abused its discretion. The trial court declined to find good cause to amend the witness list because the case had been ongoing for an extended amount of time. This does not strike us a being an unprincipled outcome where the case had been ongoing for two years, defendant had already identified and deposed an expert witness, and the deadlines for case evaluation and trial were approaching. Moreover, defendant will likely still be able to impeach plaintiffs' expert witness using the Tinsley publication.

Defendant asks this Court to review the court's decision as a discovery sanction, in accordance with *Dean v Tucker*, 182 Mich App 27, 32-33; 451 NW2d 571 (1990). In *Dean*, this Court considered a case where summary disposition was granted on the basis of the plaintiff's failure to procure an expert witness. "Where the sanction is the barring of an expert witness resulting in the dismissal of the plaintiff's action, the sanction should be exercised cautiously." *Id*. at 32. Here, defendant already had an expert witness on its witness list, Dennis Murphy, and was seeking to add an additional expert. Summary disposition was not granted or denied on the basis of defendant's failure to procure an additional expert witness. Thus, this issue should not be analyzed as a discover sanction such as in *Dean*.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.


/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello