*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FRASER ENGINE REBUILDER, INC., and
ENGINE & TRANSMISSIONS INCORPORATED,

        Plaintiffs-Appellants,

v

KENNETH ALLEN LANCASTER, CAROL
LANCASTER, and BEN LANCASTER,[1]

        Defendants-Appellees.

UNPUBLISHED
June 8, 2023

No. 360110
Macomb Circuit Court
LC No. 2019-004497-CZ

Before: GARRETT, P.J., and K. F. KELLY and HOOD, JJ.

PER CURIAM.

      Plaintiffs, Fraser Engine Rebuilder, Inc. (Fraser Engine), and Engine & Transmissions Incorporated (E&T) (collectively, plaintiffs), appeal as of right the trial court order granting summary disposition in favor of defendants, Kenneth Allen Lancaster (Kenneth) and Carol Lancaster (Carol) (collectively, defendants). That order disposed of plaintiffs' claim for misappropriation of trade secrets. But, on appeal, plaintiffs challenge the trial court's earlier opinion and order granting defendants' motion for summary disposition under MCR 2.116(C)(10), and concluding that the economic loss doctrine barred plaintiffs' tort claims.[2] We reverse and remand for further proceedings consistent with this opinion.

---

[1] The trial court dismissed the claims of plaintiffs Fraser Engine Rebuilder, Inc., and Engine & Transmissions Incorporated, against defendant Ben Lancaster for lack of personal jurisdiction.

[2] The trial court's opinion and order related to the economic loss doctrine dismissed Counts I through V of plaintiffs' complaint (two fraudulent inducement claims, two statutory conversion claims, and one breach of fiduciary duty claim), leaving only the misappropriation of trade secrets claim. That remaining claim was later dismissed by the trial court in the order from which plaintiffs appealed. Plaintiffs concede on appeal that they are not challenging the trial court's

I. BACKGROUND

This case started with service contracts for sales leads related to a business selling remanufactured engines and transmissions. Ricco Ramaci is the owner of Fraser Engine and E&T. Fraser Engine is an engine repair shop located in Fraser, Michigan, that also sold remanufactured engines and transmissions. Ramaci formed E&T in January 2016 out of concern that Fraser Engine's sale of engines and transmissions would confuse customers, since it previously acted solely as a repair shop. Ramaci, therefore, dedicated E&T to the sale of engines and transmissions. Kenneth was the principal of nonparty Lancaster Advertising & Marketing, Inc. (LAM), which operated a website known as "Powertrain Direct." Powertrain Direct generated sales leads for remanufactured engines and transmissions. It provided Fraser Engine with sales leads from late 2014 through all of 2015. In January 2016, LAM converted to nonparty MPO, Inc. (MPO) (a Texas corporation). Kenneth was the sole shareholder of MPO. Carol was an employee of MPO; according to plaintiffs' complaint, she was MPO's bookkeeper.

E&T entered two agreements with "MPO/Lancaster" relevant to this appeal, one on January 5, 2016, the other on January 26, 2016. Under the January 5, 2016 agreement, E&T paid $18,000 per month for services. Shortly after the parties entered the January 5, 2016 agreement, Kenneth sought an increase in the monthly payment from $18,000 to $32,000 a month. This prompted the parties to enter the January 26, 2016 agreement, which included the increased monthly payment. Plaintiffs alleged that, to induce E&T to enter the January 26, 2016 agreement and agree to the increased monthly payment, Kenneth represented that E&T would be the sole customer and licensee of Powertrain Direct and that all sales leads it generated would be directed to E&T. According to plaintiffs, Kenneth also represented that Powertrain Direct was the only entity he owned that operated in the market of remanufactured engines and transmissions.

In the spring of 2016, "MPO/Lancaster" asked to increase the monthly payment from $32,000 to $60,000. Plaintiffs alleged that Lancaster represented that, in exchange for another increase to the monthly payment, he would provide, through MPO and Powertrain Direct, additional "enhanced services" to "generate increased sales volumes" for E&T. Plaintiffs further alleged that these representations—and those from the earlier discussions related to the January 26, 2016 agreement—induced them to increase their monthly payment to $60,000.

Lancaster asked for price increases, to which plaintiffs agreed, at least two more times related to the Powertrain Direct services: once in September 2016 for an increase from $60,000 to $110,000 per month, and again in January 2017 for an increase from $110,000 to $150,000. According to plaintiffs, Kenneth reiterated his previous representations regarding exclusivity with respect to both of these price increases. Plaintiffs alleged that Kenneth represented that the increase to $150,000 a month would result in gross monthly revenue of over $1.8 million for E&T.

In March 2017, plaintiffs alleged, E&T learned that Kenneth had started a new company, Discount Powertrain, that was directly competitive with E&T and was a customer and licensee of

_____

dismissal of Count II (breach of fiduciary duty) or Count VI (misappropriation of trade secrets) of their complaint.

"Lancaster/MPO." They also alleged that Lancaster, without E&T's or Ramaci's knowledge or consent, diverted E&T's $150,000 monthly payments to benefit Discount Powertrain.

Separate from the January 2016 agreements, in 2015 and 2016, Kenneth and Fraser Engine discussed the development of a website, branded "Reviews Report," that was based on "concepts" and "ideas" of Ramaci. In exchange for Kenneth developing the website, Fraser Engine paid $8,000 per month, for seven months (totaling $56,000). According to plaintiffs, however, Kenneth never delivered the website or code for it, despite repeated requests. Plaintiffs further alleged that Kenneth did not use the $8,000-monthly payments for the development of the website but, instead, diverted them to an unauthorized, but unidentified, purpose. Plaintiffs also alleged that Kenneth indicated he would develop a "web-based sales program," called "Sales Fury," for E&T, that would "take the unique business challenges of E&T and address them th[r]ough the developed software." But, according to plaintiffs, Kenneth failed and refused to deliver the Sales Fury software to E&T.

Plaintiffs alleged that in November 2016, Kenneth informed E&T that venture capitalists were interested in purchasing E&T, the Sales Fury software, or both. In mid-December 2016, Ramaci met with the venture capitalist and Kenneth's son, Luke Lancaster. Plaintiffs alleged that the venture capitalist offered $15,000,000 to purchase E&T's assets. Ramaci declined the offer, which, according to plaintiffs, led Kenneth to retaliate. They alleged that Kenneth manipulated the Powertrain Direct program and reduced the sales leads it generated for E&T "to a level nowhere near commensurate with" E&T's $150,000 monthly payments. Plaintiffs alleged that when the sales leads and revenue did not increase in January 2017, despite the increased monthly payments, E&T asked Kenneth for an explanation and for meetings Kenneth had previously promised. Plaintiffs alleged that Kenneth refused these requests and stated "that E&T could simply cease to utilize the Powertrain Direct program." Regarding the allegations against Carol, plaintiffs alleged that in March 2017, she, as MPO's bookkeeper, charged $35,000 to E&T's credit card without E&T's or Ramaci's consent or authorization.

Before filing the instant case, plaintiffs sued LAM and MPO in 2017 in Macomb Circuit Court Case No. 2017-001424-CB. Their claims were based on the January 5, 2016 agreement, January 26, 2016 agreement, and an earlier August 2014 agreement. In the 2017 case, plaintiffs alleged that MPO and LAM breached the parties' agreements by failing to provide E&T with promised services, giving sales leads to E&T's competitor, and starting Discount Powertrain. Plaintiffs also included allegations related to the development of the Reviews Report website and the Sales Fury software. According to the trial court's October 13, 2021 opinion in the instant case, although the 2017 case proceeded to summary disposition, that did not resolve the case; instead, a bankruptcy stay resulted in the administrative closing of the 2017 case in early April 2019.

In early November 2019, plaintiffs filed the instant action, suing Kenneth, Carol, and Ben, and raising six claims: (1) fraudulent inducement related to statements by Kenneth that E&T would be the sole customer and beneficiary of the sales-lead software; (2) breach of fiduciary duty by Kenneth related to his failure to disclose his formation and operation of a business competitive to E&T; (3) fraudulent inducement against Kenneth related to the payment for, and creation of, the Reviews Report website; (4) statutory conversion under MCL 600.2919a related to the fraudulent inducement claims against Kenneth; (5) statutory conversion under MCL 600.2919a(1)(b) against

-3-

Kenneth, Carol, and Ben related to "receiv[ing] funds from E&T which each of them knew to have [been] obtained under fraudulent pretenses"; and (6) misappropriation of trade secrets under MCL 445.1904. According to the trial court, the allegations in the 2017 and 2019 cases were "nearly identical," though the 2017 case was based on a theory of breach of contract, rather than theories of fraud and breach of fiduciary duty like in the 2019 case.

Defendants took no action on plaintiffs' complaint until February 2020. Beginning in February 2020, defendants filed various dispositive motions, most of which are irrelevant to the issues on appeal. After defendants unsuccessfully moved for reconsideration of the denial of two of their summary disposition motions, there was no action between mid-July 2020 and mid-September 2020. Plaintiffs requested entry of default against defendants, which the Macomb Circuit Court Clerk entered the same day plaintiffs requested it. The case was essentially dormant until late February 2021, when the trial court entered a notice of intent to dismiss the case for no progress. This sparked a series of motions from the parties, including motions from defendants to set aside the defaults and a motion for entry of default judgment by plaintiffs.

In mid-April 2021, the trial court granted defendants' motion to set aside the defaults and ordered them to file their answers and affirmative defenses, and denied plaintiffs' request for entry of default judgment. Defendants, thereafter, filed individual answers, affirmative defenses, and counterclaims in late May 2021.[3]

In late July 2021, defendants again moved for summary disposition under MCR 2.116(C)(10). Citing *Brock v Consolidated Biomedical Laboratories*, 817 F2d 24, 25 (CA 6, 1987), they argued that tort actions required a breach of a duty separate and distinct from a breach of contract. They also argued that "courts have referred to the requirement that a separate and distinct duty exist as the 'economic loss doctrine' when the contract is governed by the Uniform Commercial Code (UCC)." The essence of their argument regarding each of plaintiffs' tort claims was that because each claim arose out of the parties' contract, and did not allege a violation separate from a breach of a contractual obligation, the economic loss doctrine barred each claim. Defendants also argued that the fraudulent conduct alleged in plaintiffs' complaint was subject to dismissal under *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365; 532 NW2d 541 (1995). They asserted that because plaintiffs' fraud claims were intertwined with the parties' contracts, as opposed to the fraud being extraneous to the contract, the economic loss doctrine barred those claims.

Plaintiffs responded, arguing that defendants were mistaken that the fraudulent inducement claims related to the parties' contract performance; instead, plaintiffs alleged that Kenneth's "knowingly false" representations that induced them to enter a series of contracts were the bases for the misrepresentation claim in Count I. They further argued that the economic loss doctrine was limited to cases covered by the UCC and, and fraud in the inducement was an exception to

---

[3] Defendants amended their counterclaims a number of times, including to add several nonparties. MPO also moved to join the action. Defendants, however, moved to dismiss their counterclaims without prejudice, in mid-December 2021, because they wanted to "properly file their claims as a separate action." The trial court granted the motion to dismiss and denied defendants' motion to add nonparties and MPO's motion to join.

-4-

the economic loss doctrine. Plaintiffs' argument regarding their fraudulent inducement claim in Count III provided the underlying factual basis for the claim and simply reiterated language defining a fraudulent inducement claim. Plaintiffs further argued that their statutory conversion claim in Count IV also survived because it was based on the same fraudulent conduct supporting their valid claims in Counts I and III. They also argued defendants' reliance on two cases, *Hart v Ludwig*, 347 Mich 559; 79 NW2d 895 (1956), and *Huron Tool*, 209 Mich App at 365, was misplaced. Plaintiffs asserted that *Hart* did "not impact Plaintiffs' claims in any way" and, regarding *Huron Tool*, plaintiffs argued that the economic loss doctrine was "limited to cases covered by the UCC in Michigan" and that this case was "not covered by the UCC." Plaintiffs also argued that, regardless, "*Huron Tool* recognized that fraud in the inducement is an exception to the economic loss doctrine." Because the fraud alleged in the complaint was fraud in the inducement, plaintiffs argued, *Huron Tool* did not bar their claims.

After a hearing, the trial court, in mid-October 2021, issued a written opinion and entered an order dismissing Counts I through V of plaintiffs' complaint, leaving only Count VI (misappropriation of trade secrets) remaining. The court found that the economic loss doctrine barred the two fraudulent inducement claims and the breach of fiduciary duty claim because they were related to the parties' relationship under their agreements. The court also found that the statutory conversion claims were subject to dismissal because they were "directly tied" and "predicated on" the fraud claims that had been dismissed. The court did not dismiss plaintiffs' claim for misappropriation of trade secrets, at that time.

Shortly after the court issued its opinion regarding Counts I through V, defendants moved for summary disposition of Count VI. In early November 2021, plaintiffs moved for reconsideration of the trial court's October 2021 opinion related to the economic loss doctrine. The court denied reconsideration in early December 2021, then granted defendants' dispositive motion related to Count VI.

This appeal followed. While the appeal was pending, defendants moved to dismiss the appeal, asserting that plaintiffs filed their appellate brief late and failed to serve it on defendants, thereby depriving them of the chance to respond and defend themselves. We denied that motion. *Fraser Engine Rebuilder, Inc v Lancaster*, unpublished order of the Court of Appeals, entered March 22, 2023 (Docket No. 360110).

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of a claim." *Id*. at 160 (citation and emphasis omitted). In considering a motion under MCR 2.116(C)(10), the trial court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. (citation omitted). Such a motion "may only be granted when there is no genuine issue of material fact." *Id*. (citation omitted). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

We review questions of law, like the proper application of the economic loss doctrine, de novo. *Mather Investors, LLC v Larson*, 271 Mich App 254, 256; 720 NW2d 575 (2006).

## III. OVERVIEW OF ECONOMIC LOSS DOCTRINE AND SEPARATE-AND-DISTINCT ANALYSIS

This case implicates questions of the application of the economic loss doctrine and the closely related separate-and-distinct requirement for tort claims. We begin by addressing the background of each concept applicable to plaintiffs' fraudulent inducement and conversion claims.

## A. THE ECONOMIC LOSS DOCTRINE APPLIES ONLY TO CONTRACTS FOR GOODS OR PRODUCTS, NOT SERVICES

Generally, economic losses relating to commercial transactions are not recoverable in tort. See *Quest Diagnostics, Inc v MCI WorldCom, Inc*, 254 Mich App 372, 376; 656 NW2d 858 (2002). This doctrine, known as the economic loss doctrine, is intended to maintain a distinction between damage remedies for breach of contract and for tort. *Neibarger v Universal Coops, Inc*, 439 Mich 512, 520-523; 486 NW2d 612 (1992). It provides that economic losses are only recoverable in contract. See *id*. at 520 (explaining that the economic loss doctrine provides that "where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses.") (Quotation marks, citations, and brackets omitted). As initially envisioned by this Court, this judicially-created rule "bar[red] all tort remedies where the suit is between an aggrieved buyer and a nonperformance seller, the injury consists of damage to the goods themselves, and the only losses alleged are economic." *Sullivan Indus, Inc v Double Seal Glass Co*, 192 Mich App 333, 339; 480 NW2d 623 (1991).

Eventually, the Michigan Supreme Court formally adopted the economic loss doctrine in *Neibarger*, 439 Mich at 527-528, when it held that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC[.]" The Supreme Court emphasized that

> [t]his doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. [*Id*. at 520-521.]

The Court indicated that the "proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages." *Id*. at 531. It further explained that

> the individual consumer's tort remedy for products liability is not premised upon an agreement between the parties, but derives either from a duty imposed by law or from policy considerations which allocate the risk of dangerous and unsafe products to the manufacturer and seller rather than the consumer. Such a policy serves to encourage the design and production of safe products.

On the other hand, in a commercial transaction, the parties to a sale of goods have the opportunity to negotiate the terms and specifications, including warranties, disclaimers, and limitation of remedies. Where a product proves to be faulty after the parties have contracted for sale and the only losses are economic, the policy considerations supporting products liability in tort fail to serve the purpose of encouraging the design and production of safer products. [*Id*. at 523.]

In other words, the economic loss doctrine applies to the commercial sale of goods because, unlike a consumer buying a product, a commercial buyer and seller have the ability to negotiate their duties and consequences for breach. See *id.*

Since *Neibarger*, Michigan courts have gradually clarified the scope of the economic loss doctrine. For example, in *Huron Tool* (relied on by plaintiffs on appeal) this Court interpreted *Neibarger*'s adoption of the economic loss doctrine to not expressly preclude intentional tort claims and held that the economic loss rule does not bar claims of fraud in the inducement. *Huron Tool*, 209 Mich App at 370, 374. Critically, this Court recognized in *Quest Diagnostics* that the economic loss doctrine has never been applied to a contract for services. *Quest Diagnostics, Inc*, 254 Mich App at 379-380. Further, the economic loss doctrine does not apply when the plaintiff could not have anticipated the harm at the time of the negotiations. *Id*. Taking this jurisprudence all together, this Court articulated a rule for application of the doctrine in *Quest Diagnostics*, as follows:

[P]arties to a transaction for *goods* are precluded recovery in tort for economic loss caused by inferior products where: (1) the parties or others closely related to them had the opportunity to negotiate the terms of the sale of the good or product causing the injury, and (2) their economic expectations can be satisfied by contractual remedies. [*Id*. (emphasis added).]

## B. TORT CLAIMS ARISING OUT OF A CONTRACT—THE SEPARATE-AND-DISTINCT ANALYSIS

Our Supreme Court in *Hart*, 347 Mich at 559, first addressed whether an action in tort could be maintained where it arises out of a breach of contract. There, the defendant agreed to care for and maintain the plaintiffs' orchard under an oral contract, but failed to perform the care and maintenance. *Id*. at 560. The plaintiffs, orchard owners, alleged negligence, related to the defendant's alleged failure to remove chutes, to prune, to fertilize, and to protect against destructive wildlife. *Id*. Recognizing the sometimes confusing dividing line between contract actions and tort actions, the *Hart* Court relied on a dichotomy between malfeasance (action) and nonfeasance (inaction). *Id*. at 562. It held that when a party agrees to do work, he is liable for any malfeasance, or bad action, he commits in the course of that work. *Id*. But if he agrees to do work, and simply does not do it, "no [tort] action will lie against him for the nonfeasance." *Id*. The Court further explained this principle as follows:

When the cause of action arises merely from a breach of promise, the action is in contract. The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a note, or any other promise to pay money, would sustain an action in tort for

-7-

negligence, and thus the promisor be made liable for all the consequential damages arising from such failure. As a general rule, *there must be some active negligence or misfeasance to support tort*. There must be some breach of duty distinct from breach of contract.

* * *

[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not. [*Id*. at 563, 565 (quotation marks and citations omitted; emphasis added).]

Ultimately, the Court concluded that the defendant in *Hart* merely violated the promise to complete his contracted-for performance. *Id.* at 565. Because the duty arose out of the intentions of the parties themselves, the Court concluded that a tort action could not be maintained. *Id*. at 565-566.

More recently, in *Rinaldo's Constr*, 454 Mich at 65, our Supreme Court again considered the dichotomy between misfeasance and nonfeasance in determining whether a tort claim could be maintained in a contract action. There, the Court indicated that the threshold question is "whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Id*. at 84. The Court also quoted the following passage from Prosser and Keeton to explain this inquiry:

Misfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things. Generally speaking, there is a duty to exercise reasonable care in how one acts to avoid physical harm to persons and tangible things. Entering into a contract with another pursuant to which one party promises to do something does not alter the fact that there was a preexisting obligation or duty to avoid harm when one acts. [*Id*., quoting Prosser & Keeton, Torts, § 92, pp 656-657 (quotation marks and emphasis omitted).]

Applying these principles, the Court held that the defendant in *Rinaldo's Constr* merely failed to perform according to the terms of its promise. *Id*. at 84-85. The Court noted that

there is no allegation that this conduct by the defendant constitutes tortious activity in that it caused physical harm to persons or tangible property; and plaintiff does not allege violation of an independent legal duty distinct from the duties arising out of the contractual relationship. [*Id*. at 85.]

Consequently, the Court concluded that the plaintiff had no cause of action at tort. *Id*.

## IV. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' FRAUDULENT INDUCEMENT CLAIMS

Plaintiffs first argue that the trial court erred when it found that the economic loss doctrine barred their claims for fraudulent inducement in Counts I and III of their complaint. We agree.

Here, the trial court found that the agreement between the parties was for services related to sales leads for the sale of remanufactured engines and transmissions. It also found that the economic loss doctrine "applies to both contracts for goods and contracts for services, and it applies to oral agreements." The court supported this statement of law by citing *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 84-85; 559 NW2d 647 (1997), and *Hart*, 347 Mich at 560, 562. But neither case supports the proposition that the economic loss doctrine applies to cases involving transactions for services. Instead, both cases, though involving contracts for services, addressed whether an action in tort could be maintained where it arose out of a breach of contract. *Rinaldo's Constr*, 454 Mich at 83-84; *Hart*, 347 Mich at 562-563, 565-566. Contrary to the trial court's assertion, Michigan courts have only applied the economic loss doctrine to a contract for goods and, in fact, have specifically declined to apply the doctrine to a contract for services. See *Higgins v Lauritzen*, 209 Mich App 266; 530 NW2d 171 (1995) (reversing summary disposition on basis that the economic loss doctrine was wrongly applied to a contract for services); *Quest Diagnostics, Inc*, 254 Mich App at 380 ("This Court has declined to apply the economic-loss doctrine where the claim emanates from a contract for services."). Accordingly, the trial court erred when it found that the economic loss doctrine barred plaintiffs' fraudulent inducement claims in Counts I and III, which related to the service contract at issue.

Although the trial court erroneously applied the economic loss doctrine in this case involving a service contract, the principles regarding raising tort claims for contractual breaches from *Hart* and *Rinaldo's Constr* apply. See *Hart*, 347 Mich at 559-560, 562-563, 565-566; *Rinaldo's Constr, Inc*, 454 Mich at 65, 84-85. To raise a tort claim, a plaintiff must allege a "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr*, 454 Mich at 84. Here, the trial court appeared to treat this principle and the economic loss doctrine as the same. They are, however, historically separate doctrines. Though the court erroneously applied the economic loss doctrine to this service contract, the separate-and-distinct-duty analysis is still a relevant consideration. We, therefore, reverse the trial court's application of the economic loss doctrine and remand for it to evaluate whether plaintiffs sufficiently alleged a violation of a legal duty separate and distinct from the contractual obligation with respect to their fraudulent inducement claims in Counts I and III. On remand, the trial court should consider whether plaintiffs' tort claims allege a malfeasance, as opposed to a nonfeasance, and whether tort is separate from contractual obligations.

## V. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' STATUTORY-CONVERSION CLAIM RELATED TO KENNETH

Plaintiffs argue that because their fraudulent inducement claims were valid tort claims and should not have been dismissed pursuant to the economic loss doctrine, the trial court erroneously dismissed their statutory-conversion claim in Count IV because it was based on the fraudulent inducement claims. We agree, but, as with plaintiffs' fraudulent inducement claims, we remand for the trial court to evaluate the applicability of the separate-and-distinct analysis.

The conversion statute, MCL 600.2919a, provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

-9-

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

\* \* \*

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise. [MCL 600.2919a.]

Plaintiffs' conversion claim in Count IV was related to their fraudulent inducement claims in Counts I and III, which, in turn, related to the services contract between the parties. To the extent the trial court applied the economic loss doctrine to bar Count IV, this was erroneous. See *Quest Diagnostics, Inc*, 254 Mich App at 379-380. As with plaintiffs' fraudulent inducement claims, however, there is a question of whether plaintiffs sufficiently alleged a violation of a legal duty separate and distinct from the contractual obligation with respect to the conversion claim in Count IV.

In *Loweke v Ann Arbor Ceiling & Partition Co*, 489 Mich 157, 170; 809 NW2d 553 (2011) (citations omitted), our Supreme Court recognized that "a separate and distinct duty to support a cause of action in tort can arise by statute . . . ." In evaluating whether a statute creates a particular duty with respect to a specific party, courts typically consider two questions: "(1) did the Legislature intend that the statute would prevent the type of injury and harm actually suffered by the party; and (2) did the Legislature intend that the party was within the class of persons protected by the statute?" *Randall v Mich High Sch Athletic Ass'n*, 334 Mich App 697, 720; 965 NW2d 690 (2020) (citation omitted). "If the answers to both are *yes*, then a legal duty arises from the statutory enactment." *Id*. (citation omitted).

The trial court did not address this issue below and should be the first to address it. Accordingly, we remand this issue for the trial court to evaluate whether plaintiffs suffered the type of harm MCL 600.2919a intended to prevent and whether plaintiffs, as parties to service contracts, are the types of parties the statute intended to protect. If the trial court answers both of these questions in the affirmative, then a legal duty arises from MCL 600.2919a. See *Randall*, 334 Mich App at 720.[4]

## VI. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' STATUTORY-CONVERSION CLAIM RELATED TO CAROL

Finally, plaintiffs argue that the economic loss doctrine does not bar their conversion claim related to Carol's unauthorized use of E&T's credit card because her conduct was "entirely

---

[4] Given our conclusion that the economic loss doctrine does not bar plaintiffs' conversion claim (because that doctrine only applies to contracts for goods or products, not service contracts like the ones at issue here), we need not address plaintiffs' unpreserved argument that application of the economic loss doctrine, a judicially-created doctrine, to bar a legislatively-enacted cause of action offends the separation of powers.

extraneous" to the performance terms of the contract. We agree that the economic loss doctrine does not apply to bar plaintiffs' conversion claim against Carol.

An issue must be raised in or decided by the trial court for it to be preserved for appeal. *Glasker-Davis v Auvenshire*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Plaintiffs did not raise their argument that Carol's alleged credit card charges were extraneous to the parties' contract, except perhaps in their motion for reconsideration. The issue is, therefore, unpreserved. See *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 521; 773 NW2d 758 (2009) (noting that an issue raised for the first time in a motion for reconsideration is unpreserved for appellate review). This Court reviews unpreserved issues for plain error. *Molnar v Tenacity Farm Inc*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359740); slip op at 5.[5] "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights," or was outcome determinative. *Id.* (quotation marks and citations omitted).

Plaintiffs' conversion claim in Count V was related to Carol's unauthorized use of E&T's credit card. Carol arguably had access to E&T's credit card by virtue of the services contract between the parties. To the extent the trial court applied the economic loss doctrine to bar Count V, therefore, this was plainly erroneous. See *Quest Diagnostics, Inc*, 254 Mich App at 379-380. Applying the economic loss doctrine to bar a tort claim arising out of a services contract was error, and the error was obvious for the reasons stated above. Because the error led to dismissal of plaintiffs' claim, it was also outcome determinative. As with plaintiffs' other claims, however, there is a question of whether they sufficiently alleged a violation of a legal duty separate and distinct from the contractual obligation with respect to conversion claim in Count V. As with the conversion claim in IV, the trial court should evaluate whether MCL 600.2919a imposed a legal duty on Carol not to steal plaintiffs' property. If the conversion statute was intended to protect plaintiffs from the conduct alleged in Count V, MCL 600.2919a imposed a legal duty on Carol not

---

[5] Our Court has applied two different standards to unpreserved issues in the civil context: plain-error, see, e.g., *Wischmeyer v Schanz*, 449 Mich 469, 483, 483 n 26; 536 NW2d 760 (1995); *Mr Sunshine v Delta College of Trustees*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358042); slip op at 2; *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000), and the so-called "raise-or-waive" rule, see, e.g., *In re Conservatorship of Murray*, 336 Mich App 234, 240-242; 970 NW2d 372 (2021); *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 192-194, 194 n 5; 920 NW2d 148 (2018) (acknowledging that the Michigan Supreme Court has applied the plain-error standard in the civil context and noting that the Michigan Supreme Court has yet to hold that plain-error is the correct standard to apply). Our Supreme Court has yet to state definitively which standard is the appropriate standard for the civil context. In practice, both standards are unforgiving. Here, we apply the plain-error standard because it provides a workable standard, as opposed to "raise-or-waive," which treats an issue as waived unless a panel decides there is a reason to address an otherwise waived issue. See *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008); see also *Shah*, 324 Mich App at 194-195 (declining to exercise jurisdiction to review a waived issue for want of a compelling reason to do so).

to steal plaintiffs' property. Because this issue was not addressed by the trial court, however, on remand, it should be addressed by the court in the first instance.

## VII. CONCLUSION

The economic loss doctrine applies only to contracts for goods or products, not services. This case involves a service contract, so the trial court erroneously found that the economic loss doctrine barred plaintiffs' fraudulent inducement and conversion claims. Even so, a tort action arising out of a breach of contract may be maintained when a plaintiff sufficiently alleges a duty separate and distinct from a contractual obligation. The trial court appears to have conflated the economic loss doctrine with the separate-and-distinct analysis, as opposed to conducting an evaluation of each principle independent of the other. This was erroneous.

We, therefore, reverse and remand for further proceedings consistent with this opinion. On remand, the trial court should evaluate whether plaintiffs sufficiently alleged a violation of any legal duty separate and distinct from the contractual obligations with respect to plaintiffs' fraudulent inducement and conversion claims. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Kirsten Frank Kelly
/s/ Noah P. Hood